# Illinois Official Reports

## Appellate Court

---

### *People v. Lofton*, 2015 IL App (2d) 130135

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANKLIN LOFTON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-0135 |
| Filed | July 24, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 10-CF-58; the Hon. John R. Truitt, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Thomas A. Lilien and Christopher McCoy, both of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justice Hutchinson concurred in the judgment and opinion.<br>Justice Zenoff dissented, with opinion. |

**OPINION**

¶ 1        After a jury trial, defendant, Franklin Lofton, was found guilty of three counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (b)(6) (West 2006)) and one count of attempt (armed robbery) (720 ILCS 5/8-4, 18-2 (West 2006)) arising out of the shooting death of Tyrone Dowthard. Two of the murder counts merged into the third (under subsection (a)(2)), and defendant was sentenced to a mandatory term of natural life in prison for first-degree murder, to be served consecutively to a term of 20 years for attempt. These sentences were to be served consecutively to defendant's 75-year prison sentence arising from a prior, unrelated murder conviction. Defendant now appeals from his convictions. We reverse and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        At trial, the victim's sister, Karen Dowthard, testified that she was at her home at 2319 West Jefferson Street in Rockford with Tyrone and a friend, Henry Sanders, in the evening of May 23, 2006. At around dusk, she walked out her door to her front porch and saw Tyrone, standing by his truck in her driveway, and a small, slender, light-skinned black man with a gun standing near him. Her porch light was on, so she could see the man, whom she thought was between 17 and 19 years old. He was wearing a hoodie with the hood "partially" up and had a bandana wrapped around his face; she could see only from the bottom of his eyes to the middle of his forehead. She noticed his eyes and the structure of his neck even though she saw the man only from the side. The man said, "Stick your hands up," and Tyrone laughed. The man shot him. Karen could not identify the shooter that night.

¶ 4        About a year later, police showed her a photo lineup, and she picked out a photo "[i]mmediately." She could "tell his neck" and she believed that she had seen the shooter's "braids out of the back." She recognized the shooter "from his body structure, his neck, and his eyes." The photo "jumped out" at her because "spiritually, emotionally," she felt she was "in the presence." She identified the man in the photo as defendant.

¶ 5        Sanders, who had been sitting near the bottom of the stairs of the porch at the time of the shooting, testified that, at about 11:30 p.m., a young, small black man, probably a teenager, with something covering his face came from behind the house with a "big, chrome gun" and told Tyrone to put up his hands. Sanders remembered Tyrone "putting it like I guess he thought it was a joke." The man shot Tyrone and ran away in a different direction. Sanders did not remember that he called the police, nor did he remember what he told the police that night. About a year later, he was shown a photo lineup by the police, but he could not identify anyone as the shooter.

¶ 6        Officer Patrice Turner of the Rockford police department testified that she responded to a call of a shooting at 2319 West Jefferson Street at about 11:30 p.m. on May 23, 2006. When she first saw the man she later learned was Sanders, he was "distraught, he was crying and very frantic." She later interviewed Sanders and described him as cooperative and answering questions appropriately. Sanders described the shooter as "short" and a "shorty," a term that meant a "younger person" or "a kid." Sanders further described the shooter as five feet three inches tall with a medium build. The shooter had on a gray sweater that was pulled up over the lower half of his face and something over his head. Sanders described the shooter as "a 16 or 17 year old black male" with the voice of "a younger teenager." The shooter had a "long barrel,

silver handgun." Sanders said that he had never seen the shooter before that night and was unsure if he would be able to identify him.

¶ 7    Detective Mark Jimenez of the Rockford police department testified that he interviewed Karen within hours of the shooting. He described Karen as "a little bit emotional" but able to talk. Although Jimenez initially testified that Karen thought that she could identify the shooter, on cross-examination he reviewed the report that had been written by another detective and stated that he was mistaken; Karen had stated that she "could identify his description and not his actual physical identity." Karen gave a description of a black male, five feet three inches tall, 130 pounds, wearing gray pants, a gray hooded sweatshirt, and a red and white bandana. She did not mention that his eyes, neck, or facial structure stood out to her. Karen told him that she would be unable to identify the shooter if she saw him again. Jimenez gave defendant's date of birth as January 6, 1985.

¶ 8    Deputy Dennis Hill of the Winnebago County sheriff's department testified that he was assigned to the canine unit when he was called to Karen's house around midnight on May 23, 2006. He and his canine, Hoss, were directed to the east side of the house, near the front. Hoss picked up a scent, taking Hill north, along the side of the house to the garage, then northwest, through some backyards, to the intersection of Soper and Andrew, about one block north and one block west. Hoss lost the scent there. Hill stated that, when he arrived, the scene was contaminated by the many people already there and he could not tell whether Hoss was tracking "a suspect or a witness or somebody completely unrelated" to the situation.

¶ 9    Diane McLaurin was called to testify but either could not remember events or denied that they occurred. This applied to events on or about May 23, 2006, talking to police and identifying defendant in a photo array in April 2007, and testifying before the grand jury. She did admit that her signature was on a "photo spread notice" (which had been marked as People's exhibit No. 8), but she did not recognize the document or remember what was included on it. She stated that she did not know defendant, but later admitted signing the back of "the photograph of Franklin Darielle Lofton." The State went through each question and answer from McLaurin's testimony before the grand jury, asking her if she remembered the question and giving the answer. McLaurin was confused, sometimes answering whether she remembered or not, sometimes answering as though the recited question was currently being asked. Several times, the court reminded McLaurin that "that's not the question. The question is do you remember being asked that question and giving that answer." After saying that she did not remember what year she testified before the grand jury, she denied remembering going before the grand jury at all.

¶ 10    Robert Jones, defendant's cousin, testified that he met with detectives in May 2007 and told them that he was with defendant during the day in question and that defendant had a silver .357 revolver. Defendant told him that he was planning on committing a robbery ("hitting some licks") that evening because he was broke. Defendant walked away from Jones's house but called Jones a half hour to an hour later. Defendant asked Jones to pick him up at defendant's house on Sherman because he had just shot somebody. Jones did not do so.

¶ 11    Jones saw defendant a day or two later at the home of Alonda Johnson, defendant's sister. Jones heard defendant and Johnson arguing; defendant "didn't really say anything," but Johnson was "hollering at him." The State then began reading questions and answers from Jones's grand jury testimony involving what Jones heard of that conversation; Jones did not remember his grand jury testimony. He stated that defendant never confessed any crime to

him. Jones admitted that, when he talked to the assistant State's Attorney and an investigator the day before trial, he told them that defendant had told him over the telephone that he had shot someone and needed a ride; however, Jones denied that defendant had said that the shooting had occurred on Jefferson.

¶ 12 Robert Tate testified that he was currently on federal parole following a 2008 conviction and had also been convicted of state felony charges. In May 2006, he lived with his girlfriend, Johnson, and defendant. Tate was asked if, on the morning after Dowthard's murder, he overheard a conversation among defendant, Johnson, and Jones. Tate stated, "I just know what they told me." When asked again if he had overheard defendant "telling his sister or [Jones] anything," Tate responded, "I just–I really didn't catch the conversation. I was just hearing them in there talking." The State then questioned Tate about a signed statement that he had given to police on July 12, 2007, the procedure for which he described as "what's in there is like the questions they asked me and my answers to them, but that's not my word for word, it's not what I said." Tate denied telling officers that he " 'could hear Franklin say that he had shot the dude from the night before on Jefferson.' " Instead, he explained, "What I said is what they had told me" and "everything I answered to is–is what I heard. I didn't hear the conversation." On cross-examination, Tate denied that he ever heard defendant say that he shot or robbed anyone. He heard the conversation on the morning after the murder, "but I don't know what they was [*sic*] talking about."

¶ 13 Detective Scott Mastroianni of the Rockford police department testified that he spoke with Jones in May 2007. Jones was providing information regarding Dowthard's murder in order to help Tate, who was being held in federal custody. According to Mastroianni, Jones told him that he was with defendant at 301 Royal Avenue prior to the murder and that defendant told him that he was going to "hit a lick" because he was broke. The Royal Avenue address was about three blocks away from Karen's house. Jones told him that, after defendant left, defendant called Jones's telephone and the telephone of McLaurin, who was Jones's girlfriend. Jones did not speak to defendant on either telephone. Defendant told McLaurin to have Jones pick him up "somewhere off Andrew Street"; Jones drove around but could not find him. He saw defendant the next day at the home of defendant's mother. Defendant told him that he had tried to commit a robbery on West Jefferson Street but that the intended victim laughed at him, and "he had to shoot him." Jones also said that he was with defendant at Johnson's home and heard defendant tell Johnson "about the robbery that had gone bad and where he had shot the guy on West Jefferson." Jones did not come forward with this information until almost a year after the shooting, because he was afraid that defendant would kill him.

¶ 14 Mastroianni also testified that he and Detective Jason Bailey interviewed Tate in July 2007. Bailey took notes during the interview and produced a written statement that Tate eventually reviewed and signed for accuracy. After Mastroianni described the procedure of taking the statement, the State quoted segments of the statement verbatim and asked Mastroianni if that was what Tate said. According to the statement, Tate said that he had heard about a murder on West Jefferson the year before and that, on the morning after the murder, defendant and Jones showed up at the home of Tate and Johnson and began talking to her. Tate said: (1) "They were in the dining room area talking while I was in the kitchen"; (2) "I could hear Franklin say he had shot the dude from the night before on Jefferson"; (3) "Franklin was telling his sister that he had tried to rob the guy and ended up shooting him"; (4) "I can't remember his exact words because it was over a year ago, but I know he said he shot the guy on

Jefferson. Alonda and I both told Franklin he could not stay at our house anymore"; (5) "Franklin went on to say he would quote do it again if anybody told what he had done"; and (6) "I am not sure if he was directing his comments towards me and Alonda but at [Jones] and [Jones's] girlfriend, Diane McLaurin." The State also introduced the written statement into evidence.

¶ 15    Sergeant Kurt Whisenand of the Rockford police department testified that he met with McLaurin on April 19, 2007. She told him that Jones was her ex-boyfriend and a friend of defendant.[1] She did not know defendant very well but had seen him several times with Jones. About a year before McLaurin met with Whisenand, she, Jones, and defendant were in a car as it pulled up to her cousin's house at 301 Royal Avenue. Defendant got out, said that he was going to rob somebody because he was broke, and pulled a large silver handgun from his waistband. After replacing the gun in his pants, defendant walked north on Royal Avenue, toward Andrew Street. About 20 or 30 minutes later, she received a telephone call from defendant on her telephone; she answered the call and gave the phone to Jones. About 10 minutes after Jones finished his phone conversation, he told McLaurin that defendant was hiding in some bushes and needed a ride. Jones then left. McLaurin noticed police down the block that night and heard from a neighbor that there had been a murder at 2319 West Jefferson Street.

¶ 16    McLaurin told Whisenand that she saw defendant the next day when he and Jones pulled up in front of 301 Royal Avenue. McLaurin went up to the car, and defendant showed her the same gun that he had the night before and told her not to tell anyone that she had seen him the night before. Two to three weeks before McLaurin spoke to Whisenand, she saw defendant out in traffic, and he made a motion "like he was pointing a gun at her and pulled the trigger." She did not come to the police sooner because she was afraid.

¶ 17    Whisenand also learned from McLaurin that "Darielle" had a sister "Teeka," who dated Tate. Based on conversations with other officers, Whisenand was able to identify "Teeka" as Johnson and her brother as defendant. Whisenand created a photo array that included defendant's picture; McLaurin picked out defendant's picture and indicated that that was the person she knew as Darielle. She did not know any of the other five individuals shown in the array.

¶ 18    On cross-examination, Whisenand said that he never gave McLaurin the opportunity to provide a written statement. McLaurin did not tell him that defendant had "turned in" Tate to federal authorities on a drug case, although he learned that fact later.

¶ 19    The transcripts of the grand jury testimony of McLaurin and Jones were then entered into evidence by stipulation. In his grand jury testimony (redacted to two pages), Jones agreed that defendant told him "about trying to rob a guy on Jefferson [S]treet." When asked if defendant "said anything about having to shoot him," Jones replied, "Yeah, it was something like that." However, Jones denied that defendant shot the man "because the guy laughed at him"; instead, "it was because he couldn't take the money or something from the guy, something. He got in a struggle or something with the guy."

¶ 20    Investigator Greg Lindmark of the Winnebago County State's Attorney's office testified that, two days before trial, he sat in on an interview of Jones by the assistant State's Attorney trying the case. Jones told them that he was at McLaurin's house on Royal Avenue when

_____

[1]McLaurin referred to defendant as "Darielle" and did not know his legal name.

- 5 -

defendant asked him if he "wanted to go do a lick," meaning rob someone. He did not go with defendant, who had a chrome .357 Magnum handgun. About 30 minutes later, defendant called Jones and told him that he had had to shoot someone and that he needed a ride from Andrew Street. Jones did not pick up defendant. The next day, Jones was at Johnson's home, where he heard defendant "talking about the shooting and robbery" with Johnson. Lindmark did not take a written statement from Jones, and Lindmark wrote a report about the interview only on the morning of his testimony; he did not know that such a report would be necessary until Jones had testified the day before, providing testimony that was that different from his interview.

¶ 21    After the State rested, defendant moved for a directed verdict. The trial court denied the motion, and defendant rested without calling any witnesses. The jury then returned the three guilty verdicts. This appeal followed.

¶ 22                                        II. ANALYSIS

¶ 23    Defendant raises multiple contentions of error regarding the admission of evidence and improper remarks by the State in closing argument. As defendant admits, defense counsel failed to object at trial to any of these alleged errors and further failed to file a posttrial motion. To preserve an issue for review, a defendant must both raise an objection at trial and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Thus, defendant's contentions on appeal would be forfeited. *Id.*

¶ 24    However, defendant also contends that trial counsel was ineffective for failing to object at trial and failing to file a posttrial motion. Where a defendant claims ineffective assistance of counsel, we apply the test in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Theis*, 2011 IL App (2d) 091080, ¶ 39. Under this test, the defendant must prove both that: (1) defense counsel's performance was deficient or fell below an objective standard of reasonableness; and (2) the defendant suffered prejudice as a result of defense counsel's deficient performance such that the defendant was deprived of a fair trial, the result of which is reliable. *Strickland*, 466 U.S. at 687. There is a strong presumption that a trial counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action or inaction was the product of sound trial strategy. *Id.* at 689. However, this is not the case where trial counsel's strategy was so unsound that no meaningful adversarial testing was conducted. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either prong is fatal to the defendant's claim. *Theis*, 2011 IL App (2d) 091080, ¶ 39. However, prejudice is presumed where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Where, as here, the claim of ineffective assistance was not raised in the trial court, our review is *de novo*. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006).

¶ 25    The first issue that we must consider is the State's use of witnesses' prior inconsistent statements as substantive evidence. In general, a prior inconsistent statement may be used only for impeachment purposes. *People v. Morgason*, 311 Ill. App. 3d 1005, 1010 (2000). However, under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2006)),[2] a witness's prior inconsistent statement may be admitted as substantive evidence in certain circumstances:

---

[2]See also Ill. R. Evid. 801(d)(1)(A) (eff. Jan. 1, 2011).

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

    (a) the statement is inconsistent with his testimony at the hearing or trial, and

    (b) the witness is subject to cross-examination concerning the statement, and

    (c) the statement–

        (A) the statement is proved to have been written or signed by the witness, or

        (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

        (C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

    Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein."

¶ 26 Defendant argues that Tate's written statement was not admissible as substantive evidence, because it did not meet the "personal knowledge" requirement of section 115-10.1(c)(2). According to defendant, "personal knowledge" means that "the witness must have actually perceived the events that are the subject of the statement," not merely have heard afterward the statement about the events. See, *e.g.*, *People v. Wilson*, 2012 IL App (1st) 101038, ¶¶ 38-41; *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008).

¶ 27 Our supreme court has recently spoken authoritatively on the "personal knowledge" requirement. In *People v. Simpson*, 2015 IL 116512, a witness called by the State, Vonzell Franklin, testified that he had had a conversation with the defendant about "an event" involving Phillip Thomas, who was beaten to death; Franklin could not remember what the defendant told him, nor could he remember what he told the police about the conversation. *Id.* ¶ 14. The State then called a police officer who testified about his conversation with Franklin, which had been recorded on video. The State played clips from the video, in which Franklin told police that the defendant made several incriminating statements, including " 'we beat the f*** out of that n*** man I think he dead. We bashed his head in *** I hit him about 30 times with a bat.' " *Id.* ¶ 16. Defense counsel failed to object to the introduction of the video clips.

¶ 28 The defendant argued that counsel's failure to object to the introduction of the video amounted to ineffective assistance of counsel; the State argued that the introduction of the video was proper under section 115-10.1(c)(2). The supreme court found subsection (c)(2) to be ambiguous, as it did not answer: (1) "whether the making of the statement qualifies as an event"; and (2) "whether the 'personal knowledge' requirement necessitates that the declarant observe the events described in the statement or whether it is sufficient that he observed the making of the statement." *Id.* ¶ 31. The supreme court rejected the State's argument that the legislative intent was to "require that the witness simply have personal knowledge of the defendant's admission, and not the crime being described, for a prior inconsistent statement to be admissible." *Id.* ¶ 32. Citing a "quarter of a century" of appellate court opinions holding that a prior inconsistent statement was not admissible unless the declarant actually perceived the events that were the subject of the statement, the court held that "it seems clear that the statute has a settled meaning and it would not be appropriate for us to change it." *Id.* ¶ 33. Thus, as

Franklin's videotaped statement "was not given the imprimatur of admissibility by section 115-10.1," had defense counsel objected to the use of it, "he could have precluded it from being introduced into evidence." *Id.* ¶ 34.

¶ 29 Here, Tate did not perceive the events that were the subject of defendant's overheard statement. In his written statement, Tate said that he "could hear Franklin say he had shot the dude from the night before on Jefferson" and that "Franklin was telling his sister that he had tried to rob the guy and ended up shooting him." Thus, Tate's written statement was inadmissible as substantive evidence, and its use would have been denied had defense counsel objected. We further note that, in addition to the improper admission of the written statement as substantive evidence, Mastroianni was questioned at trial about the written statement with specific quotes from the statement. Mastroianni affirmed that Tate had said: (1) "I could hear Franklin say he had shot the dude from the night before on Jefferson"; (2) "Franklin was telling his sister that he had tried to rob the guy and ended up shooting him"; and (3) "I can't remember his exact words because it was over a year ago, but I know he said he shot the guy on Jefferson." Thus, the content of the improperly admitted statement was bolstered by Mastroianni's repetitious testimony of what was contained therein.

¶ 30 This same analysis applies to portions of Jones's prior oral statements that were recounted at trial by Mastroianni and Lindmark. According to Mastroianni, Jones told him that, on the day after Dowthard's murder, defendant told Jones that he had tried to commit a robbery on West Jefferson Street but that the intended victim laughed at him and "he had to shoot him." Jones also said that he heard defendant tell Johnson "about the robbery that had gone bad and where he had shot the guy on West Jefferson." Similarly, Lindmark testified that, two days before trial, Jones told him and an assistant State's Attorney that defendant called Jones on the night of Dowthard's murder; defendant told him that he had had to shoot someone and that he needed a ride from Andrew Street. The next day, Jones was at Johnson's house, where he heard defendant "talking about the shooting and robbery" with Johnson. Jones's statements to Mastroianni and Lindmark were not made under oath at a trial, hearing, or other proceeding, nor did they narrate, describe, or explain an event of which Jones had personal knowledge. See 725 ILCS 5/115-10.1(c) (West 2006). The use of these prior statements was improper, and an objection by defense counsel would have kept that testimony out.

¶ 31 Defendant next argues that the State's use of portions of McLaurin's grand jury testimony was erroneous. The substantive use of a witness's grand jury testimony as a prior inconsistent statement under section 115-10.1 is well established as proper (see 725 ILCS 5/115-10.1(c) (West 2006); Ill. R. Evid. 801(d)(1)(A)(1) (eff. Jan. 1, 2011)), and defendant does not argue that, in general, the use of McLaurin's testimony was improper. However, during McLaurin's grand jury testimony, the following colloquy took place:

"Q. Did RJ [Jones] talk to Darielle [defendant]?

A. Yes.

Q. When he finished, did RJ tell you what Darielle had told him?

A. Yes.

Q. What did he say?

A. *He asked him can he come pick him up because he just shot someone*.

Q. Did he indicate where he was located?

A. *Yes, on Alliance and West Jefferson in some bushes*." (Emphases added.)

This exchange was not read to the jury; however, it was contained in the transcript of the grand jury testimony that was given to the jury.

¶ 32  Defendant argues that this portion of McLaurin's grand jury testimony was double hearsay and not admissible under section 115-10.1. The State never addresses the merits of this argument but labels the conveyance of the challenged testimony as "hardly a significant disclosure in light of the totality of evidence at the trial." We agree with defendant. Section 115-10.1(c)(1) and Rule 801(d)(1)(A)(1) relax the hearsay rule as it bars the substantive use of a prior inconsistent statement; however, they do not relax the general rule against hearsay contained within a prior inconsistent statement. See *People v. Radovick*, 275 Ill. App. 3d 809, 822 (1995) ("the admission of these transcripts was improper because they contained double hearsay"); *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 85 (in addressing *Radovick*, stating "even if statement is admitted substantively under section 115-10.1 of the Code, that section does not abrogate other rules of evidence, including ban on double hearsay"). Double hearsay, or hearsay within hearsay, is still excluded unless "each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Ill. R. Evid. 805 (eff. Jan. 1, 2011). As we have noted, the State makes no effort to find an exception to the hearsay rule that would apply to this part of the statement. While, in general, McLaurin's testimony to the grand jury was admissible at trial, what Jones told McLaurin that defendant told him was not. This impermissible hearsay was properly kept from the jury (at the State's suggestion and with defense counsel's concurrence) during testimony. It was error for defense counsel to allow it to go to the jury in written form.

¶ 33  The question remains as to whether defense counsel rendered ineffective assistance of counsel by failing to object to the use of these prior inconsistent statements. Regarding the first prong of the *Strickland* test, clearly, counsel's failure to object to the use of Tate's and Jones's prior inconsistent statements and his failure to keep from the jury the double hearsay contained in the transcript of McLaurin's grand jury testimony show representation that fell below an objective standard of reasonableness. While there is a strong presumption that a trial counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action or inaction was the product of sound trial strategy (see *Strickland*, 466 U.S. at 689), we can see no strategic reason for counsel's failures here. All of these statements amounted to confessions by defendant, complete with the motive for the shooting and the street upon which the murder was committed. As our supreme court has noted, " 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *Simpson*, 2015 IL 116512, ¶ 36 (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985)). Here, not only did defense counsel fail to object when the improper prior statements were introduced, counsel also failed to object when they were referenced in closing and rebuttal arguments, such as when the State argued: "These are three separate people[3] who all learned about the murder from the defendant's own mouth and chose to share that information with the police."

¶ 34  The dissent finds a "clear" defense strategy of casting McLaurin, Jones, and Tate as conspirators fabricating a story to implicate defendant in order to cut a deal for Tate, who was facing federal drug charges. *Infra* ¶ 44. According to the dissent, such a defense would have been "untenable had defense counsel not allowed Jones's oral statements and Tate's written

---

[3]Tate, Jones, and McLaurin. However, McLaurin never stated that she heard defendant say that he had killed anyone; she relayed only what Jones told her defendant said.

statement to be admitted." *Infra* ¶ 45. First, we note that a strategy of "eliciting the circumstances of Jones's and Tate's statements to police[] by establishing the close relationships among the three witnesses *** and by showing that none of them came forward until a year after the murder when Tate was in custody" (*infra* ¶ 44) would not require that the substance of these witnesses' statements be admitted into evidence. Further, such a "strategy" would be unsound. Instead of, for example, Tate's trial testimony of " 'I just–I really didn't catch the conversation. I was just hearing them in there talking' " (*supra* ¶ 12), the "strategy" allowed into evidence Tate's written statement that, among other things, (1) "I could hear Franklin say he had shot the dude from the night before on Jefferson"; (2) "Franklin was telling his sister that he had tried to rob the guy and ended up shooting him"; and (3) "I can't remember his exact words because it was over a year ago, but I know he said he shot the guy on Jefferson." The strategy got the additional benefit of an oral verbatim repetition of Tate's written statement, during Mastroianni's testimony. As applied to Jones and McLaurin, this strategy reaped similar results. If allowing all of these improper statements into evidence so that counsel could argue that it was suspicious that these witnesses all said the same thing *was* a strategy, it was an unsound one that deserves no deference.

¶ 35    The second *Strickland* prong, that the defendant suffered prejudice as a result of defense counsel's deficient performance such that the defendant was deprived of a fair trial, the result of which is reliable, is no less in doubt than the first. Other than hearsay statements involving defendant's alleged confessions to others, there is very little evidence to tie defendant to Dowthard's killing. Neither Karen nor Sanders, the only eyewitnesses to the shooting, was able to identify the shooter that night.[4] Both described the shooter as having his face covered. Sanders was unable to pick the shooter out of a photo array a year later, while Karen picked out defendant's photo a year later "from his body structure, his neck, and his eyes," all features that Jimenez testified Karen failed to mention on the night of the shooting. Instead, defendant's photo "jumped out" at her because "spiritually, emotionally," she felt that she was "in the presence."

¶ 36    The dissent finds "overwhelming support" for the jury's guilty verdict in the evidence that was properly admitted. See *infra* ¶ 48. We first note that, of all the evidence listed in the dissent's summary of the "overwhelming" evidence, only Jones's grand jury testimony made any mention of defendant saying that he shot someone on Jefferson, and the motive given for the shooting was a struggle, not that the man laughed. However, the improperly admitted hearsay statements contained at least half a dozen such references to Jefferson. In this very important respect, the properly admitted evidence was not "duplicative" of the improperly admitted evidence, as the dissent claims. See *infra* ¶ 53. The improperly admitted evidence was duplicative of itself and was drummed, repeatedly, into the jury's heads.

¶ 37    Neither Tate's written statement, nor Jones's oral statements to Mastroianni and Lindmark, was admissible substantively, because they lacked the element of personal knowledge. Similarly, the double hearsay contained in McLaurin's grand jury testimony was inadmissible as substantive evidence. Yet the jury was told repeatedly, through the use of these statements, of defendant's alleged admissions to committing the murder, complete with location and motive. We do not argue that there was not sufficient admissible evidence to convict

---

[4]Neither could agree on the timing of the shooting, either. Karen testified that the shooting occurred at about dusk, while Sanders said that it occurred at about 11:30 p.m.

defendant. However, we are not reviewing the sufficiency of the evidence, nor is it our role here to weigh "good" evidence versus "bad"; even where the evidence is sufficient to convict, if a defendant is deprived of effective assistance of counsel, the proper remedy is to reverse the defendant's conviction and remand the matter for a new trial. *People v. Young*, 306 Ill. App. 3d 350, 356 (1999); *People v. Graham*, 179 Ill. App. 3d 496, 509 (1989). We have no confidence in a verdict reached after the repeated use of improper hearsay statements, especially where defense counsel failed to attempt to keep these improper statements from the jury. The power of these detailed "admissions," in light of the scarcity of other concrete evidence, leads us to conclude that defendant has shown a reasonable probability that, but for counsel's errors, the result of the trial would have been different. Thus, defendant received ineffective assistance of counsel, which requires this court to reverse his conviction and remand the cause for a new trial.

¶ 38    Defendant raises additional contentions of error, mostly regarding allegedly improper argument by the State. The propriety of argument on retrial will depend on the evidence adduced and objections raised on retrial. We will not speculate as to what errors might occur in the future and we will not issue an advisory opinion.[5]

¶ 39                                        III. CONCLUSION

¶ 40    For these reasons, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded for a new trial.

¶ 41    Reversed and remanded.

¶ 42    JUSTICE ZENOFF, dissenting.

¶ 43    I respectfully dissent, because I believe that defendant has not satisfied *Strickland*'s prejudice prong. As I explain below, because the properly admitted, nonhearsay evidence overwhelmingly establishes defendant's guilt, I cannot agree with the majority that defendant has established a claim of ineffective assistance of counsel. I would affirm the judgment.

¶ 44    Before addressing the prejudice prong, however, I note that a reading of the record makes clear that defense counsel's strategy was to cast McLaurin, Jones, and Tate as "conspirators" who fabricated a story implicating defendant in Tyrone's murder in order to negotiate a plea deal for Tate, who was facing federal drug charges after defendant turned in Tate to the authorities. Defense counsel accomplished this strategy by eliciting the circumstances of Jones's and Tate's statements to police; by establishing the close relationships among the three witnesses; by establishing the similarities of Jones's, Tate's, and McLaurin's stories (not just that they were conferring or having a discussion); and by showing that none of them came forward until a year after the murder, when Tate was in custody.

¶ 45    During defense counsel's cross-examination of him, Mastroianni testified that, when he spoke to Jones a year after the murder, Jones was in the office of the United States Attorney, looking to get some "consideration" for Tate in his negotiations on his federal drug charges. Likewise, Mastroianni testified that Tate was in negotiations with federal prosecutors when he

---

[5] One exception is the inadmissibility of dog-tracking evidence. The State admits that the introduction of this evidence was error. Such evidence shall not be introduced on retrial.

gave his written statement. Indeed, Tate's written statement began, "My name is Robert Tate and I now live in the Ogle County Jail. I am facing a federal drug case but want to share some information about a murder on Jefferson Street last year." During closing argument, defense counsel remarked that it was suspicious how McLaurin, Tate, and Jones all came forward with the same story at the same time, shortly after defendant turned in Tate to federal authorities. Counsel referred to the three witnesses as "conspirators who ma[d]e up a story to try to get a deal." This strategy of casting the three witnesses as conspirators with a motive to fabricate a story would have been untenable had counsel not allowed Jones's oral statements and Tate's written statement to be admitted.

¶ 46        Nevertheless, I believe that it is unnecessary to more fully analyze counsel's strategy, because defendant has not shown that he suffered any prejudice as a result of counsel's alleged errors. A court need not address both prongs of an ineffective-assistance-of-counsel claim if a defendant makes an insufficient showing on one. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697.

¶ 47        A defendant satisfies the prejudice prong by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this determination, a court must consider the totality of the evidence before the judge or jury. *Strickland*, 466 U.S. at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696.

¶ 48        Even assuming that defense counsel should have objected to the introduction of Tate's written statement, Jones's oral statements to Mastroianni and Lindmark, and the hearsay portions of McLaurin's grand jury transcript, defendant has not shown that the jury's verdict would reasonably likely have been different. When the properly admitted evidence of defendant's guilt, including Jones's in-court testimony and grand jury testimony and the properly admitted portions of McLaurin's grand jury testimony, is combined with Karen's and Sanders' eyewitness testimony and the other properly admitted evidence, the evidence provides overwhelming support for the jury's guilty verdict.

¶ 49        Jones testified at trial that, on the evening of the murder, he and defendant were at 301 Royal Avenue. Defendant told Jones that he planned on "hitting some licks," which meant committing a robbery, because he was "broke." Jones saw defendant leave 301 Royal Avenue on foot. Approximately 30 minutes to 1 hour later, Jones received a phone call from defendant. Defendant asked Jones to come pick him up because "he had just shot somebody." Because defendant's statements to Jones were admissions from which guilt could be inferred, Jones's in-court testimony as to what defendant said to him was not hearsay and was properly admitted. See Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011) (providing that a party's own statement is not hearsay); *People v. Milka*, 336 Ill. App. 3d 206, 232 (2003) (explaining that a defendant's statement from which guilt may be inferred is an admission that is not objectionable under the hearsay rule (quoting *People v. Stewart*, 105 Ill. 2d 22, 57 (1984)).

¶ 50    Jones's grand jury testimony was also properly admitted. A witness's grand jury testimony that is inconsistent with his or her trial testimony is admissible as substantive evidence under section 115-10.1(c)(1) of the Code, which, unlike section 115-10.1(c)(2), does not have a personal-knowledge requirement. *People v. Harvey*, 366 Ill. App. 3d 910, 920-22 (2006). At trial, Jones professed memory loss regarding his grand jury testimony and further testified that defendant "never" confessed to him in the days following the shooting, which was sufficient to lay a foundation for admission of his grand jury testimony. See *People v. Flores*, 128 Ill. 2d 66, 88 (1989) (a witness's "professed memory loss" regarding his or her grand jury testimony is sufficient to establish inconsistency). Jones testified before the grand jury that, the day after the murder, Jones saw defendant at defendant's mother's house. Defendant told Jones about trying to rob a guy on Jefferson and having to shoot the guy. Jones explained that "it was something about because he couldn't take the money or something from the guy, something. He got in a struggle with the guy or something."

¶ 51    McLaurin's grand jury testimony was also admissible as substantive evidence pursuant to section 115-10.1(c)(1) of the Code. Like Jones, McLaurin professed memory loss at trial. Before the grand jury, however, McLaurin testified that she was with defendant and Jones at 301 Royal Avenue on the evening of the murder. Defendant said "that he was broke and he was about to go rob someone." Defendant left the house on Royal Avenue on foot, wearing a "black hoody" and blue jeans. Approximately 20 to 30 minutes later, defendant called McLaurin's phone, and she handed the phone to Jones. (McLaurin then testified that, following the phone conversation, Jones told her that defendant had said that he had just shot someone and needed a ride, which was a hearsay portion of the grand jury transcript and should have been redacted.) The next morning, McLaurin saw defendant again at the house on Royal Avenue when he and Jones drove up in a car. Defendant had a "big silver gun" wrapped in a towel or a shirt in the trunk and told McLaurin that she "shouldn't tell anyone."

¶ 52    Viewing Jones's trial and grand jury testimony and McLaurin's grand jury testimony together, a reasonable trier of fact could have found that, on the evening of the murder, defendant left 301 Royal Avenue on foot after saying that he was going to rob someone because he was "broke." He was wearing a "hoody" and blue jeans. Approximately 30 minutes later, defendant called Jones's phone and said that he had shot someone. The next day, Jones saw defendant at his mother's house, where defendant again told Jones that he had shot someone during a failed robbery. Defendant told Jones that the shooting occurred on Jefferson Street. Also the next day, Jones and defendant drove to 301 Royal Avenue and defendant had a "big silver gun" wrapped in a towel or a shirt in the trunk. Defendant told McLaurin that she "shouldn't tell anyone."

¶ 53    Most, if not all, of this properly admitted evidence is duplicative of the hearsay evidence on which the majority focuses its discussion. Thus, the record contradicts the majority's statement that, "[o]ther than hearsay statements involving defendant's alleged confessions to others, there is very little evidence to tie defendant to Dowthard's killing." *Supra* ¶ 35. In making this statement, the majority attributes little import to the fact that virtually identical statements were properly admitted through Jones's trial and grand jury testimony and McLaurin's grand jury testimony.

¶ 54    In this regard, this case is very similar to *Harvey*, in which the court affirmed the defendant's conviction despite the trial court's error in admitting two witnesses' prior written statements that contained the defendant's admissions. The court explained that it was error to

admit the written statements, because they did not satisfy the personal-knowledge requirement of section 115-10.1(c)(2). However, the court concluded that the error was harmless because "the jury was permitted to consider substantively virtually identical evidence contained in the recanting witnesses' grand jury testimonies." *Harvey*, 366 Ill. App. 3d at 921-22. The witnesses' grand jury testimonies were properly admitted pursuant to section 115-10.1(c)(1), which does not require personal knowledge. *Harvey*, 366 Ill. App. 3d at 920-22. Likewise, here, any error in admitting Tate's written statement, Jones's oral statements to Mastroianni and Lindmark, and the hearsay portions of McLaurin's grand jury transcript is harmless, as the jury heard virtually identical evidence in the form of Jones's trial and grand jury testimony and McLaurin's grand jury testimony.

¶ 55       When Jones's trial and grand jury testimony and McLaurin's grand jury testimony are combined with Sanders' and Karen's eyewitness testimony and the other properly admitted evidence, the evidence of guilt becomes overwhelming. Sanders testified that the shooter had a "big, chrome gun," which was consistent with McLaurin's testimony that defendant had a "big silver gun" in the trunk of the car on the day after the murder. Additionally, Karen testified that the shooter was wearing a "hoodie" and "some type of dark pants." This was consistent with McLaurin's grand jury testimony that, when defendant left 301 Royal Avenue on foot, he was wearing a "hoody" and blue jeans. Both Sanders and Karen testified that the shooter was a young, thin, light-skinned black male. Jiminez testified that, on the evening of the murder, Karen described the shooter as about five feet, three inches tall and 130 pounds. See generally *People v. Temple*, 2014 IL App (1st) 111653 (explaining that prior statements of identification, including police officers' testimony as to witnesses' descriptions of the offender, are admissible under Illinois Rule of Evidence 801(d)(1)(B) (eff. Jan. 1, 2011) and section 115-12 of the Code). These descriptions were consistent with Whisenand's testimony that defendant was five feet, six inches tall and 130 pounds. Furthermore, Karen estimated that the shooter was between 17 and 19 years old, while, according to Turner, Sanders estimated his age to be 16 or 17. These estimates were not inconsistent with Jiminez's testimony that defendant's date of birth is January 6, 1985, which made him 21 years old at the time of the murder.

¶ 56       The majority casts doubt on Karen's selection of defendant out of a photo array a year after the murder, explaining that Karen picked the photo based on "his body structure, his neck, and his eyes," which were features that she failed to mention to Jiminez on the night of the shooting. The majority also notes that Karen testified that the photo "jumped out" at her because "spiritually, emotionally," she felt that she was "in the presence."

¶ 57       While Karen's choice of words to express her confidence in her identification of defendant might have been idiosyncratic, her testimony was not equivocal. Karen's testimony that "spiritually, emotionally," she felt "in the presence" came at the end of a rigorous cross-examination during which she struggled to articulate the reasons for her adamancy that the photo she selected was of the shooter. She later explained that she was not "spiritually *** led to pick it out" but picked the photo because she was certain that it was of the man whom she saw shoot her brother. She testified that she got a "good look" at the shooter's eyes and that she could tell that he was a "slender guy" from the "structure of his neck," which was a "long neck." She also saw the color of his skin. Indeed, the photo depicts a light-skinned black male with an unusually long and slender neck.

¶ 58       Also supporting the jury's verdict was the evidence of the short distance between 301 Royal Avenue, from which defendant left on foot, and 2319 West Jefferson Street, where the

shooting occurred and where, Sanders testified, the shooter arrived on foot. Mastroianni testified that 2319 West Jefferson Street was only about three blocks from 301 Royal Avenue. Similarly, Whisenand testified that 2319 West Jefferson Street was 2½ blocks from 301 Royal Avenue. A map introduced into evidence confirmed the officers' testimony.

¶ 59    Viewing all of the properly admitted, nonhearsay evidence together, the evidence of defendant's guilt is overwhelming. Therefore, I cannot agree with the majority's conclusion that, other than hearsay statements, "there is very little evidence to tie defendant to Dowthard's killing." *Supra* ¶ 35. Even assuming that defense counsel should have objected to Tate's written statement, Jones's oral statements to Mastroianni and Lindmark, and the hearsay portions of McLaurin's grand jury transcript, there is no reasonable probability that, but for counsel's errors, the result of the trial would have been different.