2025 IL App (2d) 240343-U
No. 2-24-0343

Order filed March 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-DV-129 |
| JESSICA L. DUNN, | ) ) | Honorable Lisa F. Accardi, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court's refusal to admit the victim's prior conviction for general impeachment was not reviewable as plain error because the evidence at trial was not closely balanced but, rather, overwhelmingly established that defendant committed the offense and did not act in self-defense. (2) Trial counsel was not ineffective for failing to argue that the victim's threat to kill defendant during the incident was admissible to show defendant's state of mind as relevant to the self-defense theory; there was no prejudice given the strength of the State's case.

¶ 2    After a bench trial, defendant, Jessica L. Dunn, was convicted of two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2022)) and sentenced to one year of conditional discharge. On appeal, she contends that (1) the trial court committed plain error by admitting the

victim's prior conviction of domestic battery for its relevance to defendant's affirmative defense of self-defense (see *id.* § 7-1(a)) but not for general impeachment of the victim's credibility and (2) her trial attorney rendered ineffective assistance of counsel by failing to raise a proper ground for admitting evidence that the trial court barred as inadmissible hearsay. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant with domestic battery based on bodily injury (*id.* § 12-3.2(a)(1)) (count I) and insulting or provoking physical contact (*id.* § 12-3.2(a)(2)) (count II). Both counts alleged that defendant "placed her hand on [John Hatland's] throat with force."

¶ 5      Defendant gave the State pretrial notice that she was claiming self-defense. Also, before trial, defendant moved *in limine* to admit evidence that, in case No. 22-DV-129, Hatland was convicted of aggravated domestic battery and that defendant had been the victim. Defendant's motion contended that the conviction was admissible under *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971), for general impeachment of Hatland because (1) the offense was punishable by imprisonment over one year, (2) the conviction was less than 10 years old, and (3) the conviction's probative value was not substantially outweighed by the danger of undue prejudice. The motion asserted also that, under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), the conviction was admissible as relevant to defendant's claim of self-defense.

¶ 6      After hearing arguments, the trial court ruled that the conviction was not admissible under *Montgomery* to impeach Hatland, because it would be "more prejudicial than probative under the *Montgomery* factors." However, the court ruled that the conviction was admissible as evidence that defendant reasonably acted in self-defense.

¶ 7      We turn to the evidence at trial. For the State, Hatland testified as follows. In October 2022, he was residing at the home of defendant—his girlfriend—and her three children, one of whom, a

two-year-old daughter, was also Hatland's child. On October 24, 2022, at approximately 3 a.m., he was sleeping in the bedroom that he shared with defendant and their daughter when defendant shook him awake. She was kneeling on the bed next to him. She screamed at him and accused him of cheating on her. She slapped his face. He got up and walked to the foot of the bed. He and defendant yelled at each other. Defendant ran on top of the bed at Hatland. She got "in [his] face, *** grabbed [his] beard, [and] wrapped it around [her] hand and pulled [him] towards her." Hatland laughed at defendant. She screamed, "You're a piece of f*** shit," and Hatland laughed again. Defendant then let go of Hatland's beard and "smacked [him] again."

¶ 8    Asked if defendant made any other physical contact with him during the incident, Hatland replied that she "eventually grabbed [him] by the throat" with one hand and pushed him against the wall. In doing so, defendant "took some skin off" Hatland's neck and produced some "redness." When defendant grabbed his throat, Hatland told her he was going to call the police. After he called 911, he stayed in the bedroom while defendant went back and forth between the bedroom and the living room, repeatedly telling Hatland to leave. When the officers arrived, one took photographs. The State showed Hatland a photograph, which he said accurately depicted his neck on the night of the incident (the photograph). According to Hatland, the photograph showed redness and a small amount of blood. The trial court admitted the photograph into evidence.

¶ 9    Hatland testified that he felt "p*** off" during the incident, but he denied grabbing, hitting, or making any physical contact with defendant.

¶ 10    On cross-examination, Hatland acknowledged that, in January 2023, he pleaded guilty to aggravated domestic battery, a Class 2 felony. The victim was defendant.

¶ 11    The State rested.

¶ 12    Defendant testified as follows. Early on the morning of October 24, 2022, she left bed to use the bathroom. As she returned to her bedroom, Hatland confronted her in the living room. He accused her of "being on [her] phone and talking to other guys." She denied it and told Hatland that her phone was with her 12-year-old daughter, sleeping on the living-room couch. At this point, Hatland was "directly in [defendant's] face," about an inch from her nose. He was "tr[ying] to intimidate [her]." Defendant felt "[h]orrible" at that point because she "didn't know what was going to happen next." She feared for her safety because she "kn[ew] what [Hatland was] capable of." She told him to "get out of [her] face" and leave. The examination continued:

"Q. And then what happened after you made that statement?

A. He didn't. He said he was going to kill me.

MS. MILLER [(ASSISTANT STATE'S ATTORNEY)]: Your Honor, objection as to hearsay.

THE COURT: Sustained.

MR. HOLLMEYER [(DEFENSE COUNSEL)]: Your Honor, I'd—

THE COURT: And that will be stricken.

MR. HOLLMEYER: I would make the argument, [Y]our Honor, that a statement like that is an excited utterance, just for the record.

THE COURT: Sustained at this point.

MR. HOLLMEYER: Okay."

¶ 13    Defendant testified that Hatland, who was still "up in [her] face" and "very angry," "shoved" her in her "upper body, like chest area." She fell into a dresser. At that point, she and Hatland were in her bedroom; they had moved there at the time she told Hatland that her 12-year-old daughter had her phone. After the shove, defendant stood up and told Hatland to leave her

house. Hatland shoved her again, and she fell to the floor and hit her head on her other dresser. She got up and, as Hatland was "getting in [her] face," she "pushed him back" and told him to "get out of [her] face." She pushed Hatland because she feared what he might do and "needed him out of [her] house." The examination continued:

"Q. You saw [the photograph]. Do you recall seeing that?

A. Yes.

Q. That was from an area on Mr. Hatland's neck. Did you touch him in that area?

A. I don't recall.

Q. Okay. Do you recall if you put your hands on him, other than the push that you just described?

A. I might have grabbed his beard when he was *** grabbing ahold of me.

Q. Why did you grab ahold of his beard?

A. Probably because he was grabbing ahold of me at the time.

Q. Did you feel—

A. I don't remember ***."

Defendant acknowledged pushing Hatland away from her. She testified that, during the incident, her two-year-old daughter was in the bedroom.

¶ 14 Defendant testified on cross-examination that Hatland "shoved" her "to the ground multiple times." She "was hurting afterwards," but she did not recall whether she had suffered any injuries. The police arrived after the altercation. Defendant was asked, "And you didn't have anything visible, no visible injuries to show [the police]; isn't that correct?" She answered, "I don't—yeah. They didn't even look at my back." She admitted that she did not try to show the

police any injuries. She also did not tell them that she had hit her head on a dresser at least once when Hatland shoved her.

¶ 15    Defendant testified that, when she shoved Hatland, she used both hands against his chest. When asked if she "recall[ed] grabbing [Hatland's] neck[,]" she answered, "*No. I did not. I didn't grab his neck.*" (Emphases added.) Defendant further testified:

> "Q. *** So how long after this physical incident did the police arrive? Minutes?
>
> A. A few minutes.
>
> Q. Pretty quickly would you say?
>
> A. Yeah.
>
> Q. So if the police arrived pretty quickly after this physical incident, how did [Hatland] sustain all of that redness and that cut to his neck if you shoved him in the chest?
>
> A. He actually was upset. The cops weren't doing anything and weren't arresting me. He left and was gone for a while, and then went back to the police department after the police left [the] house and then made a report saying I put my hands on him."

Referencing the photograph, the State continued:

> "Q. Okay. So it's your testimony that [the photograph] is not what [Hatland] looked like when the police arrived at your house?
>
> A. No, no.
>
> Q. You have any idea how this occurred?
>
> A. No. I might have scratched him if I was falling.
>
> Q. You did testify on direct examination that you might have grabbed his beard, correct?
>
> A. Yes, yes.

Q. Okay. Which his beard [*sic*] is shown in that picture, you agree?

A. Uh-huh.

Q. So is it your testimony you might have caused that scratch when you grabbed his beard or when you shoved him?

A. I don't know how I shoved him. *** [H]e's taller than me, so I was right at probably his, you know, chest level.

Q. All right. And it's your testimony today that that is the only time you made physical contact with him—

A. Yes.

***

Q. But you agree that doesn't match the injuries that the police took photos of?

A. Right, yes."

¶ 16     On redirect examination, defendant testified that she was "pretty sure" that she "grabbed" Hatland's beard "at some point" when he was "against" her. She was "not exactly sure" if she "grabbed his neck" Other than "pushing him," she was "not sure" whether she made any physical contact with him.

¶ 17     Defendant rested.

¶ 18     In rebuttal, police officer Sean Barks testified that he arrived at defendant's home at about 3:47 a.m. on October 24, 2022. Barks spoke with Hatland. About 20 minutes after arriving at the scene, Barks took the photograph. It accurately depicted how Hatland appeared when Barks arrived.

¶ 19     In its closing argument, the State emphasized that Barks's testimony and the photograph corroborated Hatland's testimony that defendant grabbed him by the neck, and there was no

contrary evidence. In the defense's argument, counsel contended that defendant's testimony showed that Hatland was the aggressor and that defendant pushed him away because she felt threatened. Counsel continued, "As to the injury that is alleged on his neck, [defendant] stated that while she has a good memory of what happened a year-and-a-half ago, she doesn't remember everything, where all of her hands were at that point." Defendant was "not quite sure whether or not she grabbed his beard or grabbed at his beard, which could have caused the injury *** in the photograph." In rebuttal, the State contended that defendant's testimony was inconsistent with the photograph and thus was not credible.

¶ 20    The trial court found defendant guilty of both counts, stating in part:

> "[Defendant] indicated at first that she was in the living room. She told [Hatland] her daughter had the phone and testified that her daughter was sleeping on the couch.
>
> But then at that time she also contradicted herself saying that she was in the bedroom when she got shoved down by Mr. Hatland and struck her head on a dresser.
>
> Upon cross-examination that's when she tried to clarify where she was and at what time during each of the events. But there's some question in the court's mind as to the credibility of her statements in regards to where this started, where it moved to and when, as she seemed to contradict herself about her daughter being in the bedroom with her phone or her daughter being in the living room with her phone."

¶ 21    The trial court continued as follows. Defendant testified that "all she did was push [Hatland]." She never "acknowledge[d] placing her hands on his neck area, pushing him on the neck, grabbing him on the neck." Barks's testimony that he photographed Hatland's neck injuries at the scene was credible, and it discredited defendant's suggestion that Hatland was not photographed until later when he went to the police department. The court concluded:

"Defendant does not provide any explanation whatsoever for why Mr. Hatland would have all of these red marks on his neck.

So she's asserting self-defense, but then she denies even making contact with his neck.

So for those reasons I do find that her testimony was not credible in regard to that, and the court cannot get around any explanation, other than the fact that Mr. Hatland testified that she grabbed him on the neck during that time.

Those injuries were on him when the police arrived, seen by the police officer and taken by the police officer.

So for those reasons, I do make a finding of guilty on bodily harm, as well as insulting or provoking contact. Those counts will merge."

¶ 22    Defendant filed a motion for a new trial, which raised no issue about the trial court's evidentiary rulings. The trial court denied her motion and sentenced her to one year of conditional discharge. She timely appealed.

¶ 23                                  II. ANALYSIS

¶ 24    On appeal, defendant raises two issues.  First, she contends that the trial court erred in refusing to consider Hatland's prior conviction of aggravated domestic battery for impeachment. Second, she contends that trial counsel was ineffective for failing to cite a proper exception to the hearsay rule when the trial court excluded evidence that Hatland stated that he would kill defendant during the course of the altercation.

¶ 25                              A. Prior Conviction

¶ 26    Defendant first argues that the court erroneously applied the *Montgomery* test by inquiring whether the evidence was "more prejudicial than probative," instead of whether the prejudice

"*substantially* outweigh[ed] the probative value of the evidence" (emphasis added) (*People v. Williams*, 161 Ill. 2d 1, 38 (1994); see Ill. R. Evid. 609(a) (eff. Jan. 1, 2011) (evidence of prior conviction is inadmissible if "the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice")). She also reasons that any prejudice was slight because Hatland was a State witness.

¶ 27    Defendant concedes that she has forfeited this claim of error by failing to raise it in her posttrial motion. See *People v. Denson*, 2014 IL 116231, ¶ 11. Defendant requests that we review the issue under the plain-error doctrine because, she asserts, the evidence was closely balanced. "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Defendant argues only under the closely-balanced-evidence prong of the plain-error doctrine. If we determine that the evidence was not closely balanced, we need not determine whether the trial court erred in refusing to consider Hatland's prior conviction for impeachment. See *People v. Hood*, 2022 IL App (4th) 200260, ¶ 123. We indeed find that the evidence was not closely balanced, so the plain-error doctrine does not apply.

¶ 28    In contending that the evidence was closely balanced, defendant reasons that (1) the parties' versions of the altercation were manifestly inconsistent so that (2) the case hinged on credibility determinations and, hence, (3) the evidence was closely balanced. But in the context of the specific charge and the evidence pertaining to it, the evidence was not close. The key factual issues were extremely one-sided, as the trial court recognized and explained.

¶ 29    The State charged defendant with committing domestic battery in that she forcefully placed her hand on Hatland's throat. Defendant claimed self-defense.

"Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. [Citation.] The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) [that] the beliefs of the person threatened were objectively reasonable. [Citations.] If the State negates any one of these elements, the defendant's claim of self-defense must fail. [Citation.]" *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004).

¶ 30    Here, if defendant had successfully raised the issue of self-defense, the burden would have shifted to the State to prove beyond a reasonable doubt that (1) defendant committed battery against Hatland by forcefully placing her hand on his throat and (2) this act was not justified as self-defense. On neither issue was the evidence closely balanced.

¶ 31    First, the State presented clear and corroborated testimony that defendant committed the charged act. Hatland testified unambiguously that defendant forcefully grabbed him by the throat and that this action both caused bodily harm and was insulting or provoking. Further, Barks, a neutral witness, testified that he observed Hatland's injuries and that the photograph, which he took promptly after arriving at the scene, accurately depicted those injuries. The photograph also corroborated Hatland's description of his injuries. It is true that defendant testified in a manner contrary to Hatland. We note, however, that her testimony was ambiguous at times. For example, she was "pretty sure" that she "grabbed" Hatland's beard "at some point" but was "not exactly sure" if she "grabbed his neck." Moreover, Hatland's testimony was corroborated while

- 11 -

defendant's was not. Accordingly, the evidence regarding whether defendant committed the charged act was not closely balanced. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (holding evidence not closely balanced where testimony of State's witness was corroborated while the defendant's testimony was implausible); see also *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31 ("However, courts have found no 'credibility contest' when one party's version of the events was either unrefuted, implausible, or corroborated by other evidence."); *cf. People v. Tademy*, 2015 IL App (3d) 120741, ¶¶ 19-20 (finding that the case was not a "credibility contest" between two experts where testimony of a lay witness corroborated one expert's testimony).

¶ 32    Second, the State's evidence undercut any theory that defendant grabbed Hatland's neck in self-defense. Hatland, the State's only occurrence witness, testified that defendant was the persistent aggressor; she slapped his face twice, grabbed his beard, and finally grabbed his neck. He acknowledged arguing with defendant, but he denied making any physical contact with her. As noted above, Hatland's testimony was corroborated while defendant's was ambiguous. Thus, the State presented credible and unrebutted evidence that (1) defendant forcefully placed her hand on Hatland's throat, committing a battery, and (2) this act was not justified as self-defense.

¶ 33    Moreover, defendant failed to present evidence sufficient to raise self-defense as an affirmative defense. The problem is that defendant claimed self-defense but denied committing the very act for which she claimed self-defense. As noted, self-defense is an affirmative defense. *Lee*, 213 Ill. 2d at 224. "An affirmative defense has the legal effect of admitting that the acts occurred but denying legal responsibility for them." *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 32. As such, "[s]elf-defense is an all-or-nothing proposition." *Id.* On direct examination, defendant testified that she did not recall whether she "touched" Hatland's neck. On cross-examination, she positively denied that she "grab[bed] [Hatland's] neck." Later at cross-examination, she claimed

to have "no idea" how Hatland received the injuries on his neck, but added that she "might have scratched [Hatland] if [she] was falling." She also affirmed that shoving Hatland was the only physical contact she made with him. Finally, on redirect examination, she said she was "not exactly sure" if she "grabbed [Hatland's] neck."

¶ 34    Thus, defendant's testimony did not support a self-defense theory where, at best, she failed to recall whether she committed the act charged and, at worst, she affirmatively denied committing that act. As the trial court noted, defendant's testimony provided no credible explanation of how Hatland received his neck injuries. Although defendant did testify that she pushed Hatland in the chest in self-defense, she was never charged with any offense based on that specific act. The charges alleged only that she forcefully placed her hand on Hatland's throat. Because she never testified that she committed *that act*, her testimony provides no evidence that she committed *that act* in self-defense. See *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44 ("Because self-defense presupposes the intentional use of force in defense of one's person, no instruction of self-defense is applicable to an act that a defendant denies committing."). Parenthetically, we note "the well-established rule that a 'defendant may not combine the State's evidence of the defendant's act with his [or her] own testimony that he [or she] was in fear of his [or her] safety to raise the issue of self-defense.' " *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 65 (quoting *People v. Freeman*, 149 Ill. App. 3d 278, 281 (1986)). Thus, defendant cannot rely on Hatland's testimony to raise the issue of self-defense.

¶ 35    Therefore, the evidence was not closely balanced on whether (1) defendant committed the charged act or (2) she committed that act in self-defense. Because the evidence was not closely balanced, any error in the trial court's limited use of Hatland's prior conviction does not merit plain-error scrutiny.

¶ 36                              B. Ineffective Assistance Of Counsel

¶ 37    We turn to defendant's second claim of error. She contends that her trial counsel was ineffective for failing to argue that defendant's statement, "He said he was going to kill me," was admissible as nonhearsay evidence of her state of mind during the altercation. See *People v. Kline*, 90 Ill. App. 3d 1008, 1012 (1980). Defendant argues that trial counsel performed unreasonably in failing to ascertain this ground and that her claim of self-defense was undermined as a result. For the following reasons, we reject defendant's claim.

¶ 38    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); see also *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 39    Defendant has failed to satisfy the prejudice prong. Even if trial counsel performed unreasonably, there is no reasonable probability that the admission of Hatland's statement as reported by defendant would have changed the trial result. Quite simply, even with the admission of this statement, defendant would have still failed to raise a claim of self-defense, as she still would not have established that she committed the charged act (grabbing Hatland's throat), as she never conceded that she committed the act at all. Accordingly, since defendant's self-defense claim would have failed nevertheless, she suffered no prejudice from counsel's purported omission and her claim of ineffective assistance must fail.

¶ 40                              III. CONCLUSION

¶ 41    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 42    Affirmed.