2023 IL App (4th) 210612
NO. 4-21-0612

FILED
January 3, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| SYDNEY TYRONE MAYS, | ) | No. 18CF734 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

---

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justices Cavanagh and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1      In February 2021, after a bench trial, the trial court found defendant guilty of nine counts of first degree murder, one count of attempt (first degree murder), and one count of aggravated battery. On October 15, 2021, the trial court sentenced defendant to three consecutive terms of life imprisonment followed by an additional consecutive term of 50 years. Defendant appeals, making the following arguments: (1) the trial court violated his right to due process by (a) improperly relying on People's exhibit No. 48 to impute a motive to defendant and (b) misremembering Randy Nesby's testimony; (2) defendant was denied a fair trial because the State was allowed to introduce prior inconsistent statements made by Navarro Howard and Cheonte Hinkle without the State satisfying the statutory requirements of section 115-10.1 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-10.1 (West 2020)) to admit the evidence; (3) defendant received ineffective assistance of counsel because his

trial attorney failed to object to Cheonte Hinkle's unsworn testimony and other hearsay testimony; (4) defendant is entitled to a new trial because the continuum of error denied him his due process right to a fair trial; (5) the trial court erred by failing to appoint him new counsel after a preliminary *Krankel* (*People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)) inquiry; and (6) the trial court erred in imposing three consecutive terms of natural life imprisonment. We affirm the trial court's judgment.

¶ 2                                  I. BACKGROUND

¶ 3        On June 18, 2018, Nathaniel (Nate) Pena, Corey Jackson, and Juan Carlos Perez were shot and killed, and N.P., a minor, was shot and paralyzed at an apartment complex in Bloomington, Illinois. Pena and Jackson were found dead inside of apartment No. 9 at 311 Riley Drive. N.P. was found in the same apartment. Perez was found shot in a stairwell and died from his wounds.

¶ 4        On July 25, 2018, a grand jury indicted defendant on nine counts of first degree murder (720 ILCS 5/9-1 (West 2018)), one count of attempt (first degree murder) (720 ILCS 5/8-4 (West 2018)), and one count of aggravated battery (discharge of a firearm) (720 ILCS 5/12-3.05(e)(1) (West 2018)). Defendant waived his right to a jury trial.

¶ 5        In January 2021, defendant's bench trial commenced. Officer David Williamson testified he was dispatched to the apartment building at 311 Riley Drive on June 18, 2018, at approximately 2:43 p.m. Williamson found Perez in the stairwell and then came into contact with Officer Eric Yamada on the way to the third floor of the building. Williamson and Yamada entered apartment No. 9 and found Pena, Jackson, and N.P. No one else was in the apartment, but Williamson heard reports someone might be hiding in the basement laundry room.

¶ 6        Gabrielle Sweeney testified Pena was her brother. Sweeney, Pena, and N.P. ran

some errands the morning of the shooting. She dropped Pena and N.P. off at apartment No. 9 around noon. She heard Pena speaking with defendant on FaceTime while they were running errands. Pena asked defendant what time he was coming to the apartment. Defendant said he was waiting on a few guys and would then come over. Sweeney testified Pena had access to cash from selling shoes and marijuana. She stated the back door to the apartment building was always unlocked but Pena kept the door to apartment No. 9 locked.

¶ 7  Kearra Heard testified Jackson was her boyfriend in June 2018. On June 18, 2018, she and Jackson went to Pena's apartment and saw Pena and N.P. While there, Jackson and Pena smoked a marijuana blunt, and she played with N.P. She did not see any other marijuana. While at the apartment, Jackson made a Snapchat video with her and Jackson playing with a large stack of $100 and $20 bills that belonged to Pena. Jackson shared the video on his Snapchat account, but she did not know with whom he shared the video. The State introduced the video as evidence (People's exhibit No. 48). She did not know where the money had been before Jackson had it. She eventually left the apartment to pick up her daughter and came back later when she heard something had happened.

¶ 8  Brianna Watkins testified she lived in apartment No. 9 at 311 Riley Drive on June 18, 2018. Pena, who was her boyfriend of approximately two years, stayed with her four or five times a week. Pena's children, N.P. and K.P., also stayed there occasionally. On June 18, she left for work around 6 a.m. and dropped her son off at daycare. Pena was at the apartment when she left. She got off work at 2 p.m. and went straight home, arriving around 2:10 p.m. On the way to her apartment, she did not see anyone in the hallway or stairwell. The door to her apartment was locked, so she used her key to open the door. She had to push a black duffel bag on the floor out of the way of the door. She saw Pena, N.P., Jackson, and defendant in the apartment. She did not

lock the door. She had seen Jackson and defendant around Pena before and thought defendant was an associate or friend of both Pena and Jackson. Pena was watching Jackson play a game, and defendant was on his phone. Pena, Jackson, and N.P. were on a sectional sofa, and defendant was in a stadium chair by the window. She went to her bedroom and lay down for a couple of minutes and then went into the bathroom and changed her clothes. She then went back to her bedroom and grabbed her keys and phone. Around 2:30 p.m., she left the apartment to pick up her son from daycare and did not lock the apartment door. While at the apartment, she did not hear anyone come in or leave. When she left, Pena, N.P., Jackson, and defendant were still in the apartment. She did not remember seeing the black bag when she left and did not see anyone in the hallway, stairwell, or parking lot. She also testified the earbuds found by police in her bedroom did not belong to her or Pena. According to her testimony, the back door into the apartment building was unlocked about half the time, and her apartment building was connected to another apartment building through the laundry room in the basement.

¶ 9        Brianna indicated things were out of place in the apartment after the shooting. She testified Pena did not keep money or drugs at her apartment. On redirect examination, the State pointed out she told Detective Tim Power that Pena kept money and drugs in a nightstand in the bedroom, which Brianna said she vaguely remembered.

¶ 10       Robert Schrand from Joe's Towing responded to a white Chevy Trailblazer broken down on the interstate on June 18, 2018. Three people were in the vehicle. He had contact with the driver and one of the passengers. The other passenger, who was shorter and heavier than the other two men, avoided him. The driver's behavior seemed normal. He towed the vehicle to an address around Morris and Seminary Avenues but did not remember the exact address. Jahquan Howard owned the vehicle. Before he towed the Trailblazer away, a gray four-door hatchback

picked up the three men. He did not notice anything odd about the Trailblazer, but it did smell like marijuana. Schrand did not see any of the three men with a pistol, nor did it appear they were concealing one in their clothes. He also did not see a gun, any blood, a black duffel bag, or the men remove anything from the Trailblazer.

¶ 11 Travis Brady testified he lived in apartment No. 3 at 311 Riley Drive and heard gunshots on June 18, 2018. He initially thought a tree had fallen before hearing screaming. He left his apartment and saw a woman, who was screaming in Spanish, in the hallway. Brady walked to where the lady was and saw a man's body lying on the stairway platform. He then went back to his apartment and called 911. The 911 dispatcher directed Brady to go back to where the body was and see if he could see any injuries on the person and look for any weapons. Brady did not see any weapons. The dispatcher then told Brady to go back to his apartment. Brady stayed in his apartment until his father picked him up.

¶ 12 Maria Sanchez testified she was living at 311 Riley Drive, apartment No. 5, which is on the second floor of the building, on June 18, 2018. She heard three big noises, which sounded like they came from upstairs, after 2 p.m. Water started coming into her apartment from upstairs by her window. Her husband, Juan Carlos Perez, started recording the water with his cell phone. The cell phone recording was admitted into evidence and showed the water coming into the apartment at 2:35:39 p.m. He then left the apartment approximately five minutes after she heard the first three loud noises, leaving open the door to the apartment. Maria was in the kitchen and heard three more noises louder than the first three. She left her apartment and found her husband, who had been shot, on the steps leading to the third floor. Someone with gray tennis shoes was standing behind her at some point, but she did not see the person. A police officer arrived and got her out of the building. While she was outside, she and other people saw a black man with braids

looking out the window of apartment No. 9 about 10 minutes after the second round of shots. After the shooting, she saw a lighter skinned black man with braids walking around the building. She told the police she was scared of the man. She did not think this was the same man she saw in the window of apartment No. 9. Sanchez indicated she had frequently seen several black men and a white man come and go from apartment No. 9.

¶ 13    James Hardesty, a maintenance technician for First Site Apartment Services, testified he was working around building 311 on June 18, 2018, and saw a white SUV in the area with two black men inside. The driver had cornrows or short dreadlocks.

¶ 14    Detective Jared Roth of the Bloomington Police Department testified he analyzed surveillance footage from a residence at 305 Mecherle Drive and observed a white Chevrolet Trailblazer on the video near the Riley Drive apartments. Roth also observed a person run across the street from the south side of Riley Drive and enter the Trailblazer. The person running was recorded by the video camera around 2:37 p.m. The video also showed first responders arriving on the scene shortly after the Trailblazer left.

¶ 15    Officer Erik Yamada testified he responded to the shooting and did not see anyone exiting the building as he approached or inside the building as he made his way to the third floor before he encountered Officer Williamson. He smelled marijuana and gun powder when he entered the building. The door to apartment No. 9 was open, and three victims were found inside. After clearing the apartment, he stayed behind to secure the scene because they believed a suspect could still be in the building. He did not see any responding officer or emergency medical technician that was black with dreadlocks or braids.

¶ 16    Detective Martin Krylowicz, a crime scene detective with the Bloomington Police Department, testified he was involved in processing the evidence in apartment No. 9. He indicated

dresser drawers and other items were displaced and strewn on the floor in the master bedroom and it looked like someone had lifted the mattress to look underneath. Some clothes and bags were also strewn on the floor in front of the closet. On the bed, he identified an earbud headphone and a magazine for a Smith & Wesson .40-caliber pistol with one live bullet inside. No fingerprints or DNA were found on the gun magazine or bullet.

¶ 17    Detective Krylowicz testified six, .380-caliber bullet casings were found in the common hallway and the entryway area of apartment No. 9. The detectives also found water pooling on the floor in the apartment from a radiator leak. Krylowicz indicated the radiator had been hit by a bullet. Krylowicz also testified a total of 12, .40-caliber bullet casings were found inside the apartment. No fingerprints were found on the shell casings.

¶ 18    In addition, Detective Krylowicz testified three bullet projectiles were collected during Perez's autopsy, one projectile was found under Perez's body, and two projectiles were embedded in the stairway doorway. The parties stipulated these were .380-caliber bullets. The parties stipulated the bullet projectiles found inside apartment No. 9 and during Jackson's autopsy were .40-caliber bullets. The parties also stipulated the .380-caliber bullets were fired from the same gun and the .40-caliber bullets were fired from the same gun.

¶ 19    The police did not find any fingerprints on any of the bullet shell casings or the bullets themselves. The casings were also not sent to the Illinois State Police (ISP) forensic lab for DNA testing. He did not know if any of the bullets and shell casings found at the scene were shot from the magazine found in the apartment. Gunshot residue testing was done on the door handles of the Trailblazer and sent for analysis. No gunshot residue was detected. Detective Krylowicz did not see a black duffel bag or a large stack of $100 and $20 bills at the apartment.

¶ 20    Detective Krylowicz took photographs of defendant on December 6, 2018. Those

photographs were admitted into evidence.

¶ 21    Detective John Heinlen of the Bloomington Police Department testified he interviewed N.P. on August 23, 2018, at the Children's Hospital of Illinois in Peoria. The interview was conducted at the hospital because N.P. was still there as a patient. N.P. said one man shot his dad, Nate Pena. N.P. did not know what the man looked like or what his name was.

¶ 22    Navarro Howard testified Jahquan Howard is his brother. He knew defendant and Jamahri Watkins, who was Navarro's godbrother. Navarro stated he did not remember talking to defendant in the days leading up to the shooting on June 18, 2018. The State then asked Navarro about an interview he had at the Bloomington Police Department on June 22, 2018. Navarro said he remembered the interview. However, Navarro said he did not remember telling a detective that defendant had said he was coming to Bloomington from Chicago. Navarro testified he knew Jackson but did not know anything about Pena. Navarro said he did not remember telling detectives defendant was having "tude with the dude." The "dude" Navarro was referring to was Pena. Navarro also said he did not remember telling the detectives that defendant referred to Pena as a "b*** a*** n***" who was flaunting his money and calling defendant a "b***." Navarro also testified he did not remember telling the detective that Navarro asked defendant what he was going to do and defendant replied he was going to take Navarro's advice and "hit him up." In a nonresponsive statement, Navarro said defendant had never talked to him "about s*** like that." He then said, "I don't recall none of it. You tweaking. I don't know none of that s***. I don't know the interview, none of that."

¶ 23    Defense counsel then objected to the line of questioning, noting Navarro said he did not remember any of the interview. Counsel argued it was improper for the State to start putting in the interview through a witness who said he could not remember the interview. The State

responded Navarro's lack of memory allowed the State to impeach Navarro with his prior statements, giving Navarro the opportunity to acknowledge or deny the prior statements or to indicate he did not remember the prior statements. The trial court agreed. Navarro then indicated he did not remember talking to the police and lied during the entire interview. He said he lied because an assistant state's attorney and a detective were threatening Navarro's brother.

¶ 24 Navarro claimed he was not with defendant in the days before the shooting. He also denied telling the detectives defendant responded "I got that b***" when Navarro asked defendant, "[Y]ou must be rollin, huh? You dump a nine?" Navarro said he did not remember telling the detectives this meant defendant had a pistol in his possession. In addition, Navarro also denied telling the detectives he believed defendant had a .380-caliber pistol. Further, Navarro said he did not remember saying he saw defendant with a gun at Navarro's brother's house and was lying if he did say it.

¶ 25 According to Navarro's testimony, he had never heard of Pena before the shooting. He said he did not remember telling the detectives that there was a "little beef" between defendant and Pena because Pena was "outshining" and disparaging defendant. Navarro also said he did not remember telling the detectives that defendant told him he had settled the disagreement with Pena.

¶ 26 On cross-examination, Navarro said he believed he talked to the police two days after the shooting and told the police he saw defendant with a .380-caliber gun prior to the shooting. According to Navarro, he did not know if it was days, weeks, or months since he had seen defendant before the day of the shooting. Navarro claimed he lied about seeing defendant with a gun because he was trying to get his younger brother out of trouble with the police. Navarro indicated the only true thing he told the police was his name. According to Navarro's testimony, the phrase "I'm going to hit him up" means to call or text the person. The phrase "squash"

something means settle the issue. Navarro said neither phrase indicated violence. According to Navarro, in June 2018, he was on and off his "pysch meds," and he was also using cocaine, ecstasy, and alcohol.

¶ 27 Caleb Hoenes testified he and Pena had been friends since grade school. Pena made a lot of money selling marijuana, and Hoenes saw him with money at the apartment on 311 Riley Drive. According to Hoenes, Pena flaunted his money on Facebook. Hoenes believed Pena had posted a picture of himself on Facebook with a large amount of cash around the time he was killed. Hoenes indicated he did not have any kind of relationship with defendant but would see him at Pena's apartment buying weed or smoking. When he saw defendant buy marijuana from Pena, it was usually more than an amount for personal use. Pena sold smaller amounts of marijuana to individuals for personal use but also sold larger amounts to other sellers. Hoenes did not know where Pena kept the marijuana and money at the apartment. He also testified Brianna Watkins knew Pena was selling marijuana out of the apartment.

¶ 28 Jahquan Howard testified he and Jamahri Watkins lived together in the summer of 2018 at 1413 North Morris Avenue in Bloomington. Defendant was his cousin. As to the events on June 18, 2018, Jahquan testified he and Jamahri went to KMO Mattress Outlet to buy a desk. While at the store, defendant sent him a message offering $200 for a ride if Jahquan could pick him up in a hurry. Defendant told Jahquan he was at a Riley Drive address. Jahquan then drove to the Riley Drive area but did not know where he was going.

¶ 29 Jahquan testified he remembered talking to a detective on June 19, 2018, but did not remember what was said during the meeting. The State asked if Jahquan remembered telling the police defendant originally told him to come to 311 Riley Drive but then told him to stop in front of 307 Riley Drive. Jahquan said he did not remember, but that could have happened.

According to Jahquan, when he first got to the apartment complex, he did not see defendant outside so he sent defendant a message. He did not remember if defendant texted him back. The State then asked Jahquan if he remembered telling the detectives defendant responded. Jahquan said he did not remember but he could have said that to the detectives. According to Jahquan, he sent defendant multiple messages because defendant was taking several minutes. Jahquan said he did not remember telling the detectives he waited for 20 minutes but acknowledged he might have said that. Jamahri Watkins was with Jahquan. Jahquan eventually sent a message to defendant saying he was going to leave, but then defendant came out of a building. He did not remember if defendant walked or ran to the vehicle, but he got in the back of the Trailblazer. Jahquan said he did not remember hearing any gunshots or see anyone following defendant. The State asked Jahquan if he remembered telling the police defendant was running to the Trailblazer. Jahquan again said he did not remember word for word what he said. However, Jahquan testified defendant upon entering the Trailblazer told Jahquan to drive because people were shooting.

¶ 30        After Jahquan and Jamahri picked up defendant, Jahquan testified they went to Jahquan's house because defendant wanted to change his shirt. They then started for Peoria, but the Trailblazer broke down on the interstate. They made a call for a tow truck. While they were waiting for the tow, an ISP trooper pulled over behind them. After the tow truck arrived, another car pulled up driven by someone Jahquan did not know to drive them to Peoria. On the drive to Peoria, defendant said Pena was shot. Defendant then started crying. Jahquan did not remember any other conversation on the ride. Jahquan did not remember where they dropped defendant off in Peoria. The driver then drove Jahquan and Jamahri back to Bloomington. Jahquan did not notice any injuries on defendant.

¶ 31        On cross-examination, Jahquan said it was not unusual for defendant to ask for

rides. Jahquan made defendant pay when he gave him a ride. Before picking up defendant, Jahquan dropped the desk he had purchased off at his house. It did not surprise Jahquan that defendant would want to change his shirt because it was a hot day. While waiting for the tow truck, Jahquan sat in the state trooper's car talking to the trooper. Defendant was sitting on the bumper of the Trailblazer with Jamahri. Defendant did not seem concerned the police were there. Jahquan testified he did not see defendant with a bag, weapon, or stack of cash. According to Jahquan, he did not even get the $200 for picking defendant up at the apartment. Jahquan did not know how defendant learned about Pena being killed, but it was about an hour after they left the area of the apartment when he mentioned it and started crying. Nothing was said about Jackson being shot. The police came to Jahquan's house a day or two later.

¶ 32     Jamahri Watkins testified he and Jahquan stopped being roommates after June 18, 2018. Jamahri knew both Navarro Howard and defendant. On June 18, 2018, he and Jahquan went to the furniture store to get a desk. Jahquan got a text from defendant asking for a ride. They took the desk home and unloaded it before they went to pick up defendant at Riley Drive. Jamahri did not know what building defendant was in. They sat in the Riley Drive area for about 25 to 30 minutes before defendant came running to the vehicle and said someone was shooting. The three men then went back to Jahquan's house. According to Jamahri, defendant did not appear to be injured and changed his shirt because he was hot. They then left for Peoria, and Jahquan's car broke down on the interstate.

¶ 33     When the police arrived, defendant was quiet and sat with Jamahri on the bumper of Jahquan's SUV waiting for the tow truck. Jamahri said he told defendant he was sitting in oil that was on the bumper, and defendant got up. However, the State asked Jamahri if he remembered telling the police in an interview in August 2018 that he was telling defendant he was sitting in oil

- 12 -

but defendant was not listening to him. Jamahri said he did not remember that. When the tow truck arrived, defendant paid the driver in cash. Defendant had someone come pick them up and give them a ride to Peoria. After they dropped off defendant in Peoria, the driver took Jamahri and Jahquan back to Bloomington. Jamahri said he did not see defendant with a gun, bags of cash, or bags of marijuana on June 18.

¶ 34 ISP Trooper Tim Sweeney testified he was involved in a motorist assist on June 18, 2018, around 3:36 p.m. after he saw a vehicle pulled over on the side of the interstate with three males near the vehicle. Jahquan Howard told Sweeney the vehicle was his and produced identification. Sweeney did not ask either of the other men for identification. Jahquan came back to the squad car with Sweeney. Sweeney did not look in, search, or smell inside the vehicle. Defendant was talking to another state trooper on the scene while Sweeney was talking to Jahquan. Defendant did not walk away from Sweeney or the other trooper on the scene.

¶ 35 Dr. Scott Denton, a forensic pathologist, testified he performed autopsies on Perez, Pena, and Jackson. He determined all three men died from multiple gunshot wounds. During Perez's autopsy, Denton recovered three medium-caliber copper-jacketed bullets. Denton recovered a large-caliber bullet and a few bullet fragments during Jackson's autopsy.

¶ 36 Ky Williams testified he got a text message from defendant on June 18, 2018, asking for a ride. He picked defendant, Jahquan, and another guy up on the interstate and drove to Peoria. Defendant sat in the front seat. The other two were in the back seat. Williams stated defendant's demeanor was relaxed and quiet. During part of the trip, defendant was speaking to the passengers in the back. The State asked Williams if he recalled saying during his police interview on June 25, 2018, that defendant was quiet the entire ride. Williams said he did remember.

¶ 37    The State then asked Williams if he did anything during the ride in response or in reaction to defendant being quiet during the drive. Williams said he did not recall. The State then asked Williams if he remembered saying during his police interview that he messaged defendant during the ride saying defendant was "starting to tweak me up." Defense counsel objected because the State's question was not proper impeachment. The trial court sustained defense counsel's objection. The State then questioned defendant about Peoria. Williams said he dropped defendant off, defendant gave him $80 for gas money, and he then drove the other two men back to Bloomington. Williams testified he did not recall trying to contact defendant the following week. Williams said he did not remember telling the police he tried to contact defendant but defendant had not answered. As to whether defendant's phone was disconnected and whether it would be normal for it to be disconnected, Williams testified he did not recall or know. Williams said he did not remember telling a detective defendant's phone was never off.

¶ 38    The State then came back to the earlier question about whether Williams sent a message to defendant on the drive to Peoria. Williams said he did not remember. The State then asked if Williams recalled telling a detective during his interview that he messaged defendant during the drive indicating defendant was "starting to tweak [Williams] up." Williams then said he remembered.

¶ 39    On cross-examination, Williams said no one had a gun with them or a black duffel bag. He indicated defendant usually carried about $400 in cash. According to Williams, defendant's behavior during the drive was not unusual for defendant.

¶ 40    Randy Nesby testified he had known Jahquan Howard for 12 or 13 years and was his friend. The friendship had deteriorated, but Nesby bought marijuana from Jahquan. Nesby also knew Navarro Howard and Jamahri Watkins through Jahquan. Nesby denied knowing Navarro's

- 14 -

Facebook profile name. However, he recalled telling a detective in June 2018 that Navarro's Facebook name was Toni Hybreed. Nesby said he had been to Jahquan's home and always saw guns there. Four days before the shooting, he saw defendant there. On June 18, between 4:45 and 5:15, Jahquan and Jamahri came by Nesby's house. When Nesby mentioned the shooting, Jamahri was pacing and acting weird.

¶ 41    Cheonte Hinkle refused to take the oath before testifying. The trial court indicated it would take his refusal into consideration when judging his credibility. The court advised Hinkle he could still be held in contempt of court or face perjury charges if he gave false testimony. Hinkle indicated he understood. Hinkle stated he knew defendant, who was his cousin by marriage. Around July 14, 2018, Hinkle retrieved defendant's clothes and shoes from a garage at defendant's mother's house. He did not recall speaking to anyone at the house or to defendant on FaceTime. In addition, he also said he did not recall defendant looking any different on FaceTime. Hinkle claimed he did not remember talking to the police or telling the police he spoke with defendant over FaceTime and that defendant had cut his hair. On cross-examination, Hinkle said defendant spent time in Milwaukee because his dad lived there.

¶ 42    Officer William Lynn of the Bloomington Police Department testified Brianna Watkins's cell phone disconnected from the wireless network of apartment No. 9 at 2:32:10 p.m.

¶ 43    Administrative Sergeant Tim Power of the Bloomington Police Department testified he was the lead investigator on the June 18, 2018, shooting. The police identified surveillance video to help determine what happened, including video from 305 Mecherle Drive, which showed a subject running from the area of building 311 or 313 by Riley Drive and entering a white SUV on the passenger side. Surveillance footage from an Ashley Furniture store showed Brianna Watkins's vehicle when she arrived at the apartment complex. Within the first day of the

investigation, the police were able to identify the white SUV, which was registered to Jahquan Howard. The police also determined the license plate for the white SUV had been run by the ISP on June 18 at 3:36 p.m. Power talked to Sweeney about his contact with the vehicle and received the recording of the encounter. Sweeney identified defendant in a photo lineup. From the ISP video, Power was able to identify defendant, Jahquan Howard, and Jamahri Watkins.

¶ 44        Power testified Jahquan Howard and Jamahri Watkins were brought in for questioning. Both confirmed the trip to Peoria, a description of the vehicle that picked them up on the interstate, and that defendant was dropped off in Peoria. The police determined Ky Williams picked up defendant and the other two men from the interstate.

¶ 45        Power testified a warrant was issued for a Snapchat account with the handle "Syd May 7." The e-mail attached to the "Syd May 7" Snapchat account was SydneyMays7@yahoo.com. The phone number 1-312-566-3121 was linked to the Snapchat account. This was the phone number that was communicating with Jahquan Howard with regard to getting a ride from Riley Drive. Power identified a Snapchat video from June 17, 2018, of defendant. Defendant was wearing the same type of earbuds found in apartment No. 9. He also noted a Snapchat video from June 29, 2018, showed defendant counting money. During the month following the shooting, Power tried to locate defendant using every resource available. Defendant was eventually arrested in Milwaukee, Wisconsin. Power went to Milwaukee and brought defendant back to McLean County. Defendant's hair was short at that time.

¶ 46        On cross-examination, Power said defendant's father lived in Milwaukee. Power said defendant had short dreadlocks before the shooting but defendant's hair was cut short at the time of his arrest. Power indicated Pena, Jackson, N.P., and defendant were in the apartment at the time of the shooing based on the statement of Brianna Watkins. Power acknowledged Watkins told

Power that she did not look over and see defendant when she left the apartment and was not certain he was there. Power also acknowledged Watkins said the door to the apartment was unlocked when she left. Further, Power stated neither defendant's DNA nor fingerprints were found anywhere in apartment No. 9 and the earbuds were not unique.

¶ 47 Power testified the police executed a search warrant on Jahquan Howard's house but did not find any guns, a black bag, a large amount of cash, or a large amount of marijuana. Further, Power said gunshot residue testing was performed on the SUV but none was found. He also acknowledged Brianna Watkins lied in her testimony saying there was not a large amount of cash or drugs in apartment No. 9. Power indicated he knew Pena was a drug dealer and a prior shooting had occurred at this same apartment complex.

¶ 48 In addition, Power acknowledged defendant's text to Jahquan asking for a ride "ASAP" was sent at 2:10 p.m., which was before Brianna Watkins was back at the apartment. At 2:13:43, defendant sent Jahquan a message saying to pick him up at 311 Riley Drive. At 2:14:25, defendant sent Jahquan another message telling him to park in front of 307 Riley Drive. The last text message defendant sent to Jahquan was at 2:28 p.m. At that time, Brianna would have still been in the apartment. At 2:31, 2:34, and 2:37 p.m., Jahquan sent defendant messages, but defendant did not respond. The surveillance footage showed a person running from the area of the apartments and entering the passenger side of the white Chevy Trailblazer at approximately 2:37 p.m.

¶ 49 On redirect examination, Power said Brianna told him she could hear the apartment door open and close from her bedroom and did not hear anyone come into or go out of the apartment when she was there.

¶ 50 During Detective Power's testimony, the State introduced, the trial court admitted,

and the State published portions of Brianna Watkins's, Jahquan Howard's, and Cheonte Hinkle's respective police interviews. After Power's testimony, the State introduced, the court admitted, and the State published segments of police interviews with Navarro Howard, Ky Williams, and Jamahri Watkins.

¶ 51 Defendant chose not to testify, and the defense called no witnesses.

¶ 52 On February 3, 2021, the trial court issued its ruling, providing an extensive overview of the evidence in the case. When discussing Brianna Watkins's testimony, the court indicated it understood Watkins told the detectives she was not 100% sure defendant was still at the apartment when she left to pick up her child from daycare. When discussing Randy Nesby's testimony, the court indicated Nesby said he was at Jahquan Howard's home on June 18 after the shooting with defendant, Jahquan Howard, and Jamahri Watkins. According to the court, Nesby had learned from Facebook about the shooting, which he mentioned to defendant, Jahquan, and Jamahri. The court indicated Nesby testified Jamahri was pacing and acting weird when Nesby mentioned the shooting.

¶ 53 The trial court noted these murders likely happened because of drugs or money. The court found Caleb Hoenes's testimony to be credible. The court noted Hoenes testified Pena sold marijuana, uploaded pictures of large amounts of money to Facebook, and kept money in the back bedroom of the apartment. This was known by a lot of people. The court also found the part of Navarro Howard's testimony that defendant and Pena had "beef" between each other because Pena was "outshining him" to be credible. Although no drugs, money, or guns were found, the court stated credible evidence was presented that the individuals involved in this case had access to these things. The court then noted Randy Nesby bought weed from Jahquan Howard at Jahquan's house and said guns were always present at Jahquan's house. Nesby also testified

defendant was sometimes present at Jahquan's house. The court indicated Nesby saw guns at Jahquan's house four days before the shooting and Navarro told the police defendant had a .380-caliber pistol before it became public knowledge Perez was shot with a .380-caliber bullet.

¶ 54 The trial court also recognized and considered the fact other people could have left the apartment buildings after the shooting but before the police arrived. As for the man with gray tennis shoes standing behind Maria Sanchez in the stairwell, the court indicated he was not a credible suspect based on the time and location Sanchez saw the shoes. The court also acknowledged Sanchez's observations of a man with braids in the window of apartment No. 9 three to four minutes after the police arrived. However, as to her observation, the court noted Sanchez had understandable confusion as to the time because of what she had been through.

¶ 55 As to the large amount of cash in the Snapchat video of Corey Jackson and Kearra Heard taken in apartment No. 9 a few hours before the shooting, the trial court stated it understood the money was not located after the shooting. The court further acknowledged the State did not prove this was the same money in defendant's Snapchat video posted 11 days after the shooting.

¶ 56 With regard to what happened in the apartment after Brianna Watkins left, the trial court noted it found credible Brianna Watkins's testimony the earbuds were not present on the bed when she left and did not belong to her or Pena. The court found the first set of shots had been fired by 2:35:39 p.m. because that is when the water coming through the ceiling into the apartment was filmed. The court stated it was convinced that someone with that type of earbuds was in the apartment and shot Pena, Jackson, and N.P. Although the type of earbuds was not unique, defendant was wearing the same type of earbuds in a Snapchat video from the day before the shooting.

¶ 57 The trial court also indicated it considered evidence of defendant's flight presented

by the State. This included defendant's offer to pay $200 to Jahquan Howard if he would pick him up as soon as possible at the apartment complex. The court also noted defendant ran to the white Trailblazer and was aware of the shooting. They then went to Jahquan's house and shortly thereafter left for Peoria and broke down on the interstate. Defendant was very quiet and looking at his phone on the ride. Jahquan said defendant started crying when he saw a Facebook post that Pena and N.P. had been shot. The court stated:

> "[Defendant] already knew that the shooting took place because when he first got in the Trailblazer he said 'they shooting.' Further, Randy Nesby said he brought up the shooting when he was over at [Jahquan's] house before Mr. Howard, [defendant,] and Mr. Watkins left for Peoria. He said that Jamahri was acting weird and pacing around at that time."

The court indicated it found defendant's behavior on the ride to Peoria unusual.

¶ 58       The trial court also noted Cheonte Hinkle talked to defendant on FaceTime after the shooting and noticed defendant had cut his hair. The court also noted Ky Williams tried to call defendant's phone the day after the shooting but defendant's phone had been disconnected, which was unusual because defendant always had his phone. The court stated defendant's phone records showed he was an active user.

¶ 59       Although recognizing defendant's father lived in Milwaukee and defendant sometimes spent time there, the trial court stated it was convinced defendant had gone to Milwaukee to avoid the police and the State's evidence of his flight showed a consciousness of guilt. The court also found the timeline established by the phone records, texts, and social media activity compelling. In the approximately 3½ minutes between when Brianna Watkins's phone disconnected from the apartment's wireless network at 2:32:10 p.m. and the water started leaking

from the radiator in apartment No. 9 into the apartment below at 2:35:39 p.m, the individuals in apartment No. 9 were shot. The court clearly believed the State established defendant was still in the apartment when Watkins left, even though she was not certain. According to the court, the evidence did not support a theory someone came into the building from outside or entered the apartment itself through the unlocked apartment door during the short period after Brianna left and the water started leaking. The court noted the evidence showed no signs of struggle inside the apartment. The evidence also supported the conclusion nothing had disturbed the status quo inside the apartment before Pena, N.P., and Jackson were shot. The shooter then encountered Perez at the door to apartment No. 9 and shot and killed him with a .380-caliber weapon. Navarro Howard said defendant possessed a .380-caliber handgun. Then at 2:37 p.m., defendant is seen in surveillance footage coming from the front of building 311 and entering Jahquan Howard's white Trailblazer. Further, the court noted the evidence showed all the .40-caliber bullets recovered at the scene were fired by one weapon and the .380-caliber bullets were fired by one weapon. In addition, the court noted N.P. told the police that one man shot his dad.

¶ 60        Based on the totality of the evidence presented, the trial court found the evidence convinced it beyond a reasonable doubt that defendant shot and killed Nate Pena, Corey Jackson, and Juan Carlos Perez and shot N.P. The court indicated it found defendant guilty on each and every count of the indictment.

¶ 61        On February 25, 2021, defendant's trial counsel filed a motion to reconsider or, in the alternative, a motion for a new trial. On April 15, 2021, defense counsel was given leave to withdraw from the case. Defendant proceeded *pro se* and was given leave to adopt and supplement defense counsel's posttrial motion. The trial court also gave defendant additional time to supplement the posttrial motion. On September 21, 2021, defendant filed an ineffective assistance

of counsel claim and supplemented his posttrial motion.

¶ 62      On October 4, 2021, the trial court conducted a preliminary *Krankel* inquiry into defendant's claims his trial counsel was ineffective. The trial court and defendant addressed a variety of defendant's claims, one of which was that his trial counsel was unaware Brianna Watkins told the police she was not entirely sure defendant was still in the apartment when she left to pick up her child and failed to impeach her with this statement. After the matter was discussed by the trial court, defense counsel, and defendant, defense counsel indicated he believed he failed to confront Watkins with her prior statement when she testified during the State's case. However, counsel indicated the court ordered the State to make Watkins available during defendant's case. When Detective Power testified for the State, he admitted on cross-examination that Brianna said she was not entirely sure defendant was still at the apartment when she left. From a strategic standpoint, counsel stated he believed this was a better way to get this information into the case because Brianna was not able to explain her prior statement. Counsel also noted the trial court was clearly aware of Brianna's statement regarding her lack of complete certainty.

¶ 63      The trial court mentioned defendant's claim his trial counsel should have objected to Detective Power's testimony that Brianna Watkins said she thought a drug deal was going to happen after she left the apartment. However, defendant did not offer any additional explanation on this claim.

¶ 64      After hearing from defendant and defendant's trial counsel, the trial court did not find any basis to appoint counsel to investigate defendant's claims of ineffective assistance of counsel. The trial court then heard arguments on and denied defendant's posttrial motion.

¶ 65      On October 15, 2021, the trial court sentenced defendant to three consecutive terms of life in prison followed by an additional consecutive term of 50 years in prison.

¶ 66        This appeal followed.

¶ 67                              II. ANALYSIS

¶ 68                              A. Due Process

¶ 69        Defendant first argues the trial court violated his due process rights by (1) improperly relying on People's exhibit No. 48 to impute a motive to defendant despite the exhibit being irrelevant for that purpose and (2) misremembering Randy Nesby's testimony. Citing *People v. Williams*, 2013 IL App (1st) 111116, ¶ 81, 103-04, 2 N.E.3d 552, defendant argues a defendant is denied due process where the record reveals affirmative mistakes in the trial court's decision-making process.

¶ 70        Defendant was not denied due process in this case. The trial court did not rely on People's exhibit No. 48, which was a video posted to Corey Jackson's Snapchat account showing Corey Jackson and Kearra Heard playing with a big stack of money at apartment No. 9 a few hours before the shooting, to impute a motive on defendant. The court only noted the video showed a large amount of money in apartment No. 9 before the shooting and the money was not found in the apartment after the shooting. The court did mention defendant had a large sum of money in similar denominations to the money seen in People's exhibit No. 48 in a video defendant posted to Snapchat 11 days after the shooting. However, the court clearly understood the State never established the money in the two Snapchat videos was the same.

¶ 71        As to Randy Nesby's testimony, the trial court did misstate it. Nesby testified Jahquan Howard and Jamahri Watkins were at his house a few hours after the shooting. Nesby had learned about the shooting on Facebook and brought it up in conversation. According to his testimony, when he did so, Jamahri acted strangely. When the trial court was explaining its decision in this case, the court incorrectly stated Nesby said he was at Jahquan Howard's house

- 23 -

with Jahquan, Jamahri, and defendant after the shooting occurred.

¶ 72 Defendant argues the trial court's error undercut part of his defense that the State failed to prove its case because defendant's mannerisms and behavior immediately following the Riley Drive shooting were not consistent with a person who had just shot multiple individuals. We disagree. The trial court's mistake did not prejudice defendant in any manner and certainly did not amount to a violation of his due process rights. The court did not mistakenly indicate Nesby saw defendant acting strangely after the shooting. Instead, the trial court correctly indicated Nesby saw Jamahri acting strangely. We fail to see how this mistake affected the trial court's judgment against defendant in this case.

¶ 73 B. Prior Inconsistent Statements

¶ 74 Defendant next argues he was denied a fair trial because the trial court allowed the State to introduce prior inconsistent statements made by Navarro Howard and Cheonte Hinkle without the State satisfying the foundational requirements of section 115-10.1 of the Criminal Procedure Code (725 ILCS 5/115-10.1 (West 2020)), which provides:

"Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein."

The supreme court also included similar language in the Illinois Rules of Evidence. See Ill. R. Evid. 801(d)(1) (eff. Oct. 15, 2015).

¶ 75 According to defendant, the State's practice of reading portions of the transcripts of Navarro Howard's and Cheonte Hinkle's respective interviews with the police ignored the requirements of section 115-10.1 and Rule 801 and constituted reversible error.

¶ 76 1. *Navarro Howard's Prior Statements*

¶ 77 Defendant takes issue with the State being allowed to introduce Navarro Howard's prior inconsistent statements regarding defendant's relationship with Pena and defendant's possession of a gun before the Riley Drive shooting without satisfying the requirements of section

115-10.1. Defendant argues this was reversible error.

¶ 78      Defendant concedes he failed to properly preserve his arguments with regard to Navarro's prior inconsistent statements. Defendant asks us to consider the issue under the first prong of the plain-error doctrine. The plain-error doctrine allows a reviewing court to consider an unpreserved error if the defendant establishes a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error was so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process even if the evidence was not closely balanced. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Generally, the first step in any plain-error analysis is determining whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. It is the defendant's burden to show a clear or obvious error occurred and a prong of the plain-error doctrine applies. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).

¶ 79      We first consider defendant's argument that Navarro's prior inconsistent statements related to any relationship between defendant and Pena were inadmissible because Navarro had no personal knowledge of the relationship and Navarro's testimony was not inconsistent with his prior statement to the police. Citing *People v. Cooper*, 188 Ill. App. 3d 971, 973, 544 N.E.2d 1273, 1274 (1989), defendant argues section 115-10.1 requires the prior statements to be based on the witness's personal observations. According to defendant, Navarro's prior statements about defendant's relationship with Pena were not based on Navarro's personal observations. Instead, defendant argues Navarro was simply recounting things defendant had told him.

¶ 80      However, while the State did not establish Navarro had personal knowledge of defendant's relationship with Pena through the prior statements it introduced, defendant does not

explain why Navarro's prior statements did not show he had personal knowledge of defendant's feelings toward Pena. Navarro had personal knowledge of conversations he had with defendant, and his prior statements to the police narrated, described, and explained those conversations. According to Navarro's statement to the police, defendant expressed his feelings about Pena to Navarro. At trial, defendant testified he did not remember talking to defendant during the period leading up to the shooting. However, the Second District in *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 53, 194 N.E.3d 961, has held:

> "Whether the witness had the requisite personal knowledge is not determined from the witness's trial testimony but rather from the face of the statement. [Citation.] The rationale for making this determination from the witness's statement is to prevent the 'turncoat' witness from precluding the admission of the prior statement by simply testifying that he or she did not see or does not remember what happened."

As a result, defendant has failed to establish Navarro did not have personal knowledge of statements made by defendant to him about which Navarro told the police.

¶ 81 We next consider defendant's argument the State did not meet the requirement found in section 115-10.1(a) (725 ILCS 5/115-10.1(a) (West 2020)) that the defendant's prior statement be inconsistent with his testimony at trial. According to defendant, Navarro's testimony was not inconsistent with his prior statements to the police. We disagree.

¶ 82 Defendant argues the State did not ask Navarro anything about defendant's feelings toward Pena before introducing Navarro's statement to the police. However, as previously indicated, the State asked Navarro whether he had a conversation with defendant in the days leading up to the shooting, and Navarro testified he did not remember talking to defendant during

this period. At that point, it likely would have been fruitless for the State to ask Navarro additional questions about things said by defendant about Pena during a conversation defendant testified he did not remember having.

¶ 83    In addition, when the State questioned Navarro about statements he made to the police regarding defendant's feelings toward Pena, Navarro testified he did not remember the vast majority of his interview with the police. In *Guerrero*, 2021 IL App (2d) 190364, ¶ 50, the Second District stated:

> "A statement's consistency is measured against the witness's trial testimony. [Citation.] The witness's prior statement need not directly contradict his or her trial testimony to be considered inconsistent. [Citation.] For example, a witness's evasive answers, silences, and changes in position [citation]; inability to recall [citation]; and omission of 'a significant matter that would reasonably be expected to be mentioned if true' [citation] at trial have been deemed inconsistent with the witness's prior statements. The determination of whether a statement is inconsistent is left to the trial court's discretion."

As a result, because Navarro testified he did not remember his interview with the police, his testimony is considered to be inconsistent with the statements he made in his interview with the police.

¶ 84    Defendant has failed to establish the introduction of Navarro's prior statements to the police constituted a clear or obvious error because Navarro's prior statement was based on his own personal knowledge of defendant's feelings toward Pena and his trial testimony was inconsistent with his prior statement to the police.

¶ 85    In addition, based on our prior analysis, we find no merit in defendant's claim he

received ineffective assistance of counsel because his trial counsel did not object to the State's introduction of these prior inconsistent statements. To establish ineffective assistance of counsel, a defendant must show deficient performance by his attorney and prejudice from the deficient performance. Here, defendant was not prejudiced by his attorney's failure to object because any objection likely would have been overruled. We need not address this issue further.

¶ 86 We next consider defendant's argument that the State introduced improper evidence of Navarro's prior statement to police he had seen defendant with a gun and thought defendant had a .380-caliber handgun prior to the Riley Drive shooting. Again, defendant argues the State failed to establish an inconsistency between Navarro's trial testimony and his prior statement to the police related to defendant's possession of a gun. According to defendant, "the State never asked Navarro a simple question, like, 'Did you see [defendant] with a gun a few days before June 18, 2018?' "

¶ 87 Defendant concedes in his brief he did not properly preserve this issue for this court's review. Once again, defendant asks us to review the issue pursuant to the plain-error doctrine or find his trial counsel was constitutionally ineffective for not objecting to the State's introduction of this evidence. Based on our previous analysis, defendant's arguments fail. Navarro testified he did not remember being with defendant in the period leading up to the shooting. If Navarro claimed he did not remember being with defendant in the period leading up to the shooting, he also would not have remembered seeing defendant with a handgun during this same period, had the State asked that precise question.

¶ 88 While the State could have done a better job establishing the foundation for admission of Navarro's prior statements, this is a situation where "defendant's lack of a timely and specific objection deprive[d] the State of the opportunity to correct any deficiency in the

foundational proof at the trial level." *People v. Woods*, 214 Ill. 2d 455, 470, 828 N.E.2d 247, 257 (2005). Defendant has failed to establish the introduction of Navarro's prior statement rose to the level of a clear or obvious error or that defendant was prejudiced by his trial counsel's failure to object, because the objection likely would have been overruled.

¶ 89                           2. *Cheonte Hinkle's Prior Statement*

¶ 90          Defendant also argues the trial court abused its discretion by allowing the State to introduce Cheonte Hinkle's prior statement to the police that he knew defendant cut his hair after the shooting. The State asked Hinkle if he noticed anything unusual about defendant's appearance after talking with defendant while Hinkle was at defendant's mother's house. Hinkle testified he did not. Hinkle denied telling the police defendant had cut his hair.

¶ 91          Defendant objected to the State asking Hinkle about his prior statement to the police, claiming the State was going to impeach defendant with hearsay evidence. According to defense counsel, Hinkle had only heard a rumor defendant had cut his hair after the shooting. The court overruled defendant's objection. Defendant argues the court erred in allowing the State to introduce Hinkle's prior statement defendant had cut his hair after the shooting.

¶ 92          The State argues the trial court did not err by allowing the State to admit Hinkle's prior statement. Further, according to the State, even if the court erred by allowing the State to introduce Hinkle's prior statement, the error was harmless. An evidentiary error "is harmless where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original and internal quotation marks omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104, 5 N.E.3d 328.

¶ 93          We need not address the substance of defendant's argument. Even assuming, *arguendo*, the trial court erred in allowing Hinkle's prior statement into evidence, the error was

harmless. The State introduced other evidence, which defendant does not challenge, that defendant cut his hair after the shooting. No reasonable probability exists the trial court would have acquitted defendant absent Hinkle's statement to the police about defendant cutting his hair.

¶ 94　　　　　　　　　　　　C. Ineffective Assistance of Counsel

¶ 95　　　　Defendant next argues his trial counsel was constitutionally ineffective. According to defendant, his trial counsel failed to move to exclude Cheonte Hinkle as a witness by objecting to his unsworn testimony, failed to reassert his objection to Ky Williams's hearsay testimony, and failed to object to hearsay testimony from Detective Power.

¶ 96　　　　To establish a claim of ineffective assistance of counsel, a defendant must show his attorney's performance fell below an objective standard of reasonableness and resulting prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Strickland*, 466 U.S. at 689. To demonstrate prejudice, a defendant need only establish a different outcome would be reasonably probable absent the ineffective assistance. *Strickland*, 466 U.S. at 694. Our supreme court has indicated reviewing courts may proceed directly to *Strickland*'s prejudice prong and need not consider whether the attorney's performance was deficient to dispose of an ineffective assistance of counsel claim. *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 97　　　　　　　　　　　　1. *Cheonte Hinkle's Testimony*

¶ 98　　　　Cheonte Hinkle refused to swear or affirm he would testify truthfully. The trial court told the parties it would take this into consideration when judging Hinkle's credibility. The court admonished Hinkle he was still subject to perjury charges if he gave false testimony, which

Hinkle stated he understood. Defendant's trial counsel failed to object to Hinkle testifying without swearing or affirming he would testify truthfully.

¶ 99 Defendant argues he was prejudiced because the State would not have been able to introduce Hinkle's prior statement regarding defendant cutting his hair had defendant's trial counsel objected to Hinkle being allowed to testify. This is a situation where we can proceed directly to the prejudice prong of the *Strickland* analysis. As we previously stated, the State introduced evidence defendant cut his hair in ways other than Hinkle's statement—the testimony of Detective Power and video and photographic evidence. Therefore, defendant cannot establish he was prejudiced by his trial counsel's failure to object to Hinkle testifying.

¶ 100 2. *Ky Williams's Text Message to Defendant*

¶ 101 Defendant next argues his trial counsel was ineffective because he did not reassert a hearsay objection related to the substance of a text message Williams sent to defendant while driving defendant to Peoria after the shooting. When the State only asked Williams whether he had done anything in response to defendant being quiet on the drive to Peoria before trying to introduce the content of the text message Williams sent to defendant, defense counsel objected, arguing the preliminary question was too broad to impeach Williams with regard to his answer he did not recall what he did. The trial court agreed.

¶ 102 However, after asking Williams some other questions, the State came back to the defendant's silence during the car ride to Peoria and specifically asked Williams if he sent defendant a message from his phone to defendant's phone during the car ride. Williams testified he did not recall. At that point, the State could ask Williams if he remembered telling the police he sent defendant a message during the drive saying defendant was "starting to tweak [him] up."

¶ 103 Citing *Guerrero*, 2021 IL App (2d) 190364, ¶¶ 44-53, defendant concedes the State

could ask Williams about his statement to the police after Williams said he did not recall sending a message to defendant during the drive. However, citing *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 32, 42 N.E.3d 885, defendant then argues the content of the message was still inadmissible because section 115-10.1 and Rule 801(d)(1)(A) of the Illinois Rules of Evidence (Ill. R. Evid. 801(d)(1)(A) (eff. Jan. 1, 2011)) do not provide an exception for double hearsay. According to defendant, the content of the text message Williams sent to defendant is inadmissible double hearsay.

¶ 104      Defendant's reliance on *Lofton* is misplaced. In *Lofton*, 2015 IL App (2d) 130135, ¶ 23, the defendant raised several evidentiary issues, which were not properly preserved by his trial counsel. Defendant's brief only cites paragraph 32 of *Lofton*, where the Second District was discussing the substantive use of a witness's grand jury testimony as a prior inconsistent statement under section 115-10.1 (725 ILCS 5/115-10.1(c) (West 2006)) and Rule 801(d)(1)(A)(1) of the Illinois Rules of Evidence (Ill. R. Evid. 801(d)(1)(A)(1) (eff. Jan. 1, 2011)). *Lofton*, 2015 IL App (2d) 130135, ¶ 32.

¶ 105      The defendant in *Lofton* did not argue the use of the witness's grand jury testimony was improper in general. *Lofton*, 2015 IL App (2d) 130135, ¶ 31. However, the jury was given a transcript of the grand jury testimony that included the witness stating another person told her that the defendant said defendant had just shot someone and needed a ride. *Lofton*, 2015 IL App (2d) 130135, ¶ 31. The defendant argued this was double hearsay and not admissible under section 115-10.1. While the witness's grand jury testimony was generally admissible, the Second District held the jury should not have learned of statements allegedly made by the defendant to a third party, which were then repeated by the third party to the witness. *Lofton*, 2015 IL App (2d) 130135, ¶ 32.

¶ 106      In the instant case, defendant argues the State should not have been able to

introduce the content of a message Williams sent from his phone to defendant's phone. Unlike in *Lofton*, this is not a situation where the State was trying to introduce statements allegedly made by defendant to a third party who then informed Williams of the defendant's alleged statements. The State was only introducing a statement made by Williams to the police about the content of a text message he sent to defendant. Based on the argument in defendant's brief, defendant's trial counsel's lack of an objection was not unreasonable. Further, even assuming *arguendo* defense counsel should have objected to the introduction of this evidence, defendant cannot establish he was prejudiced by the introduction of this text message by Williams.

¶ 107                    3. *Hearsay Statement From Brianna Watkins*

¶ 108        Defendant next argues his trial counsel was ineffective for not objecting to the State's elicitation of allegedly improper hearsay testimony from Detective Power that Brianna Watkins believed the people inside apartment No. 9 were waiting for her to leave the apartment so they could conduct a drug deal. Defendant argues this was clearly hearsay and counsel should have objected. According to defendant, this evidence changed the trier of fact's perception of what was going on at the apartment from a few friends hanging out into a dangerous drug setting. We disagree.

¶ 109        The State concedes Watkins's statement was inadmissible hearsay. As a result, we will skip directly to the prejudice prong of the ineffective assistance analysis. Brianna Watkins testified Pena was friends with both Corey Jackson and defendant. She did not testify she thought they were waiting for her to leave so they could have an argument or physical fight. Further, the State presented other evidence both defendant and Pena were drug dealers. Defendant cannot establish a reasonable probability exists that the result in this case would have been different had Watkins's statement not been admitted.

¶ 110                              4. *Aggregate Prejudice*

¶ 111          Defendant next argues the above instances of his trial counsel's allegedly deficient

performance prejudiced defendant when considered all together. We need not discuss this

argument further because our prior holdings show no possibility for aggregate prejudice as to the

ineffective assistance claims raised by defendant.

¶ 112                            D. Continuum of Error

¶ 113          Defendant next argues a continuum of error occurred in this case, denying him a

fair trial. According to defendant's brief, the errors in this case improperly established a motive

for defendant to commit the shooting in this case, placed a weapon in defendant's hands in the

days leading up to the shooting, and introduced other circumstantial evidence of defendant's guilt.

Noting the State's case was entirely circumstantial with no physical evidence directly linking

defendant to the shooting, defendant argues the errors he alleged and we previously addressed

likely resulted in his conviction. As a result, defendant argues his conviction should be reversed

due to the cumulative effect of the alleged errors.

¶ 114          Our supreme court has indicated the cumulative effect of multiple errors may deny

a defendant a fair trial. *People v. Speight*, 153 Ill. 2d 365, 376, 606 N.E.2d 1174, 1178 (1992).

          "An appellate court's resolution of the argument that the cumulative effect

          of various trial errors warrants reversal depends upon the court's evaluation of the

          individual errors. If the alleged errors do not amount to reversible error on any

          individual issue, generally there is no cumulative error. [Citation.] However, where

          errors are not individually considered sufficiently egregious for an appellate court

          to grant the defendant a new trial, but the errors, nevertheless, create a pervasive

          pattern of unfair prejudice to the defendant's case, a new trial may be granted on

the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526, 831 N.E.2d 681, 694 (2005).

While some mistakes were made in defendant's trial, including the trial court misstating Nesby's testimony and the State being allowed to introduce Brianna Watkins's statement she believed a drug deal was going to occur when she left her apartment, these errors neither individually prejudiced defendant nor created a pervasive pattern of unfair prejudice to defendant. As a result, we find no merit to defendant's argument he was denied his due process right to a fair trial.

¶ 115                           E. *Krankel* Inquiry

¶ 116        Defendant next argues the trial court erred in denying his *pro se* posttrial claim his trial counsel was ineffective without appointing new counsel to investigate and litigate his ineffective assistance of counsel claims. When a defendant *pro se* raises a claim of ineffective assistance of counsel, the trial court is required to conduct a preliminary inquiry into the factual basis of the defendant's claim or claims and may also consider the legal merits of the claims. *People v. Moore*, 207 Ill. 2d 68, 77-78, 797 N.E.2d 631, 637 (2003). "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Moore*, 207 Ill. 2d at 78. A claim lacks merit when it is misleading, conclusory, legally immaterial, or does not bring to the trial court's attention a colorable claim his attorney provided ineffective assistance. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 22, 960 N.E.2d 27. "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Moore*, 207 Ill. 2d at 78.

¶ 117        An attorney's strategic decisions normally are not subject to a claim of ineffective assistance of counsel. However, if the attorney's strategy was objectively unreasonable, a defendant may potentially overcome the strong presumption of sound trial strategy. *People v.*

*Maya*, 2019 IL App (3d) 180275, ¶ 27, 127 N.E.3d 1099; *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 42, 139 N.E.3d 663.

¶ 118    Defendant does not argue the trial court failed to conduct a proper preliminary inquiry. Instead, he simply argues the court erred in not appointing new counsel to investigate his claims. As a result, we will not disturb the court's ruling denying his *pro se* claims unless the court's decision was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98, 162 N.E.3d 223. "Manifest error is error that is clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98.

¶ 119    According to defendant's brief, defendant established his trial counsel possibly neglected his case for two reasons. First, when Brianna Watkins testified defendant was in her apartment when she left to go pick up her child, defense counsel was not aware Watkins told the police she was not certain defendant was in the apartment when she left. Second, defense counsel failed to object to Detective Power's testimony about Brianna Watkins's hearsay statement she believed a drug deal was going to take place when she left the apartment.

¶ 120    Regarding the impeachment of Brianna Watkins with her statement to the police, the trial court noted defense counsel cross-examined Detective Power about Brianna's concession to the police. The detective agreed Brianna did say she was not certain defendant was in the apartment when she left. The court specifically noted this statement by Brianna when it was explaining its findings in this case. According to the court, defense counsel's decision to bring out Brianna's statement through Detective Power and not question Brianna about her statement was sound trial strategy because it denied Brianna the chance to explain away the potential significance of the statement.

¶ 121    Defendant argues his attorney's decision not to impeach Brianna with her prior

statement to the police could not have been strategic because his trial counsel was not aware of the prior statement until after she testified. Defendant stated he and his trial counsel got into a heated discussion about Brianna's statement, defense counsel checked the statement, and counsel then apologized to defendant and said he would fix the issue. According to defendant, the trial court's ruling was manifestly erroneous and constituted improper " '*post hoc* rationalization' for counsel's decisionmaking that contradict[ed] the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011).

¶ 122 Regardless, the trial court's ruling on this issue was not manifestly erroneous. Even assuming, *arguendo*, defendant's trial counsel was unaware of Brianna's statement to investigators that she was not sure defendant was in the apartment when she left, defendant cannot establish any prejudice from the situation. Defendant's trial counsel did bring this information out while cross-examining Detective Power, and the trial court considered the statement when determining defendant's guilt.

¶ 123 Turning to defendant's argument his trial counsel was ineffective for failing to object to Detective Power testifying Brianna told him she thought Pena, Jackson, and defendant were waiting for her to leave so they could conduct a drug deal, defendant did not address this issue at the preliminary *Krankel* hearing. However, the trial court still addressed the issue because it was raised in defendant's written motion, finding counsel's decision not to object was a strategic decision.

¶ 124 Defendant argues Brianna did not offer any testimony regarding that statement, so allowing the statement to go unchallenged could not have been part of a reasonable trial strategy. As stated, defendant asserts the trial court engaged in " '*post hoc* rationalization' for counsel's decisionmaking that contradict[ed] the available evidence of counsel's actions." *Harrington*, 562

U.S. at 109.

¶ 125　　　　Once again, however, defendant was not prejudiced by defense counsel's failure to object to this hearsay statement. The State had already presented evidence both Pena and defendant were drug dealers. Significantly, Watkins did not say she thought defendant was waiting for her to leave so they could argue or engage in violence. As a result, the trial court's decision not to appoint counsel to defendant was not manifestly erroneous.

¶ 126　　　　　　　　　　　　　　F. Mittimus

¶ 127　　　　Finally, defendant asserts the trial court erred in sentencing him to three consecutive terms of natural life imprisonment. Defendant argues his sentence is not compliant with the plain language of section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018)), which states "the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and *** is found guilty of murdering more than one victim." Defendant asks this court to correct the mittimus to show the imposition of only one term of natural life imprisonment.

¶ 128　　　　Citing *People v. Holley*, 2019 IL App (1st) 161326, ¶ 36, 129 N.E.3d 683, defendant acknowledges he forfeited this issue but asks us to apply the second prong of the plain error doctrine. The State concedes the trial court erred by imposing multiple natural life sentences and agrees defendant's sentence should be corrected. We are not persuaded and do not accept the State's concession.

¶ 129　　　　Defendant essentially argues he can be sentenced to only one term of natural life even though he was found guilty of the first degree murder of three individuals. Defendant provides no analysis for his argument other than saying the plain language of section 5-8-1(a)(1)(c)(ii)

supports his conclusion. Further, defendant cites no authority to support his interpretation, and we have found none. As a result, not only did defendant not properly preserve this issue in the trial court, he also failed to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires an appellant to provide this court with argument and authority to support his argument.

¶ 130　　　　Instead of arguing defendant had not provided any authority or analysis in support of his argument, the State conceded the issue without providing this court with authority or analysis supporting its concession. While we do not want to discourage the State from conceding an issue where appropriate, we are troubled by the State's concession, considering defendant provided no authority or analysis in support of his argument.

¶ 131　　　　More importantly, based on our review of the plain language of section 5-8-1(a)(1)(c)(ii), the trial court did not err in imposing three natural life sentences. Section 5-8-1(a)(1)(c)(ii) states:

> "(a) Except as otherwise provided in the statute defining the offense or in Article 4.5 of Chapter V, a sentence of imprisonment for *a felony* shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> (1) for first degree murder,
>
> * * *
>
> (c) the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and:
>
> ***

(ii) is found guilty of murdering more than one victim[.]" (Emphasis added.) 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018).

In this case, defendant was charged with and convicted of nine counts of first degree murder (three counts for the death of Pena, three counts for the death of Jackson, and three counts for the death of Perez). The counts with regard to each respective victim merged. As a result, the trial court sentenced defendant on three counts of first degree murder—one felony count for each victim. As a result, pursuant to the plain language of section 5-8-1(a)(1)(c)(ii), the trial court did not err in sentencing defendant to a natural-life term for each of the three victims.

¶ 132 Defendant did not make an alternative argument his natural-life sentences should not run consecutively assuming, *arguendo*, he could be sentenced to a natural-life sentence for the murder of each of the victims. However, we note section 5-8-4(d)(1) of the Corrections Code (730 ILCS 5/5-8-4(d)(1) (West 2018)) mandates consecutive sentences if one of defendant's convictions was for first degree murder. Further, in *People v. Petrenko*, 237 Ill. 2d 490, 506-07, 931 N.E.2d 1198, 1208 (2010), our supreme court found section 5-8-4 of the Corrections Code should be enforced "without regard to the practical impossibility of serving the sentences it yields." The supreme court stated "[t]he legislature has determined that the imposition of consecutive natural-life sentences serves a legitimate public policy goal, and even if its effect is purely symbolic, it is within the purview of the legislature to make that determination." *Petrenko*, 237 Ill. 2d at 506. Thus, we will not disturb the sentences imposed by the trial court, and we deny defendant's request to amend the mittimus.

¶ 133                                    III. CONCLUSION

¶ 134          For the reasons stated, we affirm the trial court's judgment.

¶ 135        Affirmed.

*People v. Mays*, 2023 IL App (4th) 210612

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 18-CF-734; the Hon. John Casey Costigan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Austin Wright, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Douglas Malcolm, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |